Juanita TIDWELL, Plaintiff,

v.

**AMERICAN OIL COMPANY, a Foreign Corporation, doing business in the State of Utah, Defendant.**

No. C 240–68.

United States District Court,
D. Utah, C. D.

Sept. 2, 1971.

426

Donn E. Cassity, Stephen G. Morgan, and Ford G. Scalley, Salt Lake City, Utah, for plaintiff.

Albert J. Colton, Salt Lake City, Utah, and James A. Sullivan III, Chicago, Ill., for defendant.

David R. Cashdan, Washington, D. C., Equal Employment Opportunity Commission, amicus curiae.

## OPINION

RITTER, Chief Judge.

In this case plaintiff charges that she was fired by defendant, American Oil Company, because she refused to discriminate on the basis of race against an applicant for employment. Plaintiff was a resident of Salt Lake City, Utah, at the time the alleged unlawful practice occurred and also at the time this suit was filed. Defendant is incorporated in Maryland and licensed to do business in Salt Lake City, Utah. Defendant is also a national product marketing, manufacturing, distributing and research affiliate of Standard Oil of Indiana with a regional office in Salt Lake City. This action is brought pursuant to 42 U.S.C. § 2000e–3(a) and § 2000e–5(g) for the economic loss plaintiff suffered from her wrongful discharge.

## JURISDICTION

Defendant has persistently maintained that this court does not have jurisdiction of the case. Two separate jurisdictional defects are alleged: (a) That plaintiff failed to commence timely state proceedings as a condition precedent to bringing an action in the federal courts, and (b) That plaintiff failed to commence this action within ninety days after filing charges with the EEOC. Defendant raised these allegations initially on a motion to dismiss. The court denied that motion then and finds no reason to rule otherwise now.

The following events preceded this suit: Plaintiff was employed by defendant in December, 1961. On October 21, 1966, plaintiff was given a choice between voluntarily resigning or being discharged, and on October 24, 1966, she elected to be discharged. The next day (October 25) plaintiff went to the office of the Anti-Discrimination Division of the Utah Industrial Commission and met with M. Phyl Poulson, Executive Secretary of the Division, and Henry Adams, Assistant Attorney General for the State of Utah. At that time plaintiff complained orally of her discharge, but she was not advised of any need to file a written complaint.

After numerous consultations and telephone conversations with Mr. Poulson, plaintiff received a letter (dated November 28, 1966) from Mr. Poulson asking her to sign and file written complaints against defendant, which were enclosed. On December 22, 1966, plaintiff executed and filed the complaints with the Utah Commission. The following day Mr. Poulson forwarded the complaint on the federal form to the Equal Employment Opportunity Commission, with the explanation that the complaint did not meet the time requirements of the Utah statute.

The EEOC finally served the complaint on defendant on February 23, 1967. After an unsuccessful attempt to obtain voluntary compliance with Title VII from defendant, the EEOC sent plaintiff notice of her right to institute a civil action within thirty days pursuant to 42 U.S.C. § 2000e–5(e). Plaintiff received the notice on November 15, 1968, and subsequently filed this action on December 13, 1968.

*State Proceedings*

Before persons aggrieved by unlawful employment practices may pursue the remedies provided by Title VII of the Civil Rights Act of 1964, they must first resort to certain state remedies as follows:

"In the case of an alleged unlawful employment practice occurring in a State, or political subdivision of a

State, which has a State or local law prohibiting the unlawful employment practice alleged and establishing or authorizing a State or local authority to grant or seek relief from such practice or to institute criminal proceedings with respect thereto upon receiving notice thereof, no charge may be filed under subsection (a) of this section by the person aggrieved before the expiration of sixty days after proceedings have been commenced under the State or local law, unless such proceedings have been earlier terminated * * *." 42 U.S.C. § 2000e–5(b).

Subsection (a) referred to above permits the filing of charges with the EEOC. Utah has a statute prohibiting the practice alleged and the state procedures in question are found in Utah Code Ann. § 34–17–7(1) and § 34–17–7(15).[1] Defendant insists that the Utah statute requires the filing of a *written* complaint with the Anti-Discrimination Division within thirty days after the alleged discriminatory practice as a prerequisite to any state action. As indicated above, plaintiff went to the responsible state agency and orally complained of her discharge within four days of the effective date of her termination. The written complaint was not filed until approximately sixty days after the alleged violation. Defendant asserts that plaintiff's oral complaint was totally ineffective to commence the state's administrative procedures.

■ This court holds that plaintiff's oral complaint was sufficient to "commence" state proceedings as required by Title VII. Utah's statute, while *authorizing* a *written* complaint,

*does not require* all complaints to be in writing. The statute provides that "any person claiming to be aggrieved * * may * * * make, sign and file with the commission a written complaint * * *." Utah Code Ann. § 34–17–7(1). An aggrieved employee *may* file a written complaint, but the statute neither requires a written complaint nor prohibits an oral complaint. Indeed, Mr. Poulson's practice was to institute informal proceedings to bring about a conciliation. Poulson did not inform plaintiff of any need for a written complaint until after his limited effort at seeking a solution and after he had already contacted the EEOC to arrange for that agency to attempt a solution. A form furnished by the Commission (Utah Code Ann. § 34–17–7(1)) was not made available to plaintiff until more than thirty days after her initial complaint.

Defendant contends that the case of Goodman v. City Products Corporation, Ben Franklin Division, 425 F.2d 702 (6th Cir. 1970), should control the interpretation of the Utah statute. In *Goodman,* the plaintiff filed his lawsuit in the federal district court thirty-one days after receiving notice from the EEOC of his right to file suit. The statute 42 U.S.C. § 2000e–5(e), provides: " * * * [T]he Commission shall so notify the person aggrieved and a civil action may, within thirty days thereafter, be brought against the respondent named in the charge * * *." The plaintiff in that case argued that the thirty-day requirement was merely directory, but the court held: "The permissive verb 'may' refers to the option of the aggrieved party to bring a lawsuit, not to a discretion in the

---

1. The alleged practice was prohibited by Utah Code Ann. § 34–17–6(e).

§ 34–17–7(1) provided in part: "Any person claiming to be aggrieved by a discriminatory or alleged unfair employment practice may, * * *, make, sign, and file with the commission a written complaint in duplicate, on form to be furnished by the commission, which shall state the name and address of the person, employer * * * alleged to have committed the discriminatory or unfair employment practice complained of, and which shall set forth the particulars thereof and contain such other information as may be required by the commission."

§ 34–17–7(15) required that: "Any complaint filed pursuant to this chapter must be so filed within thirty days after the alleged discriminatory or unfair employment practice occurred."

The above statutes were repealed and replaced in 1969 by Utah Code Ann. §§ 34–35–6(e), 34–35–7(1) and 34–35–7(15) (Supp.1970).

Court to receive the case following the expiration of 30 days." 425 F.2d at 703. Defendant maintains that the word "may" in the Utah statute likewise refers to the option of bringing a complaint and not to the form of the charge. However, the federal statute deals with a time limitation and the state statute deals with a matter of form. The thirty-day limitation in the federal statute is clearly an intentional limitation. The Utah statute, however, is completely silent as to the efficacy of proceeding under an oral complaint. Absent any showing that the Utah legislature intended that all complaints be in writing, the court holds that a written complaint was not required in the circumstances of this case.

Defendant points out that Poulson's letter of transmittal sent with the complaint to the EEOC states that plaintiff's complaint did not meet the time requirements of the statute. That, however, is obviously an excuse devised to justify not taking further state action on the matter. Poulson was an employee of defendant American Oil on leave of absence. He requested the EEOC to assume investigation of plaintiff's complaint because of this serious conflict of interest.

■■ Defendant also contends that the Tenth Circuit decision in Love v. Pullman, 430 F.2d 49 (1969), affirmed on rehearing, 430 F.2d 56 (10th Cir. 1970), requires that the Utah procedures for commencing an action be strictly construed—requiring a written charge within thirty days. In Love v. Pullman, the plaintiff did not file a charge with the EEOC until May, 1966, whereas state proceedings had terminated in July, 1965, after being revived by an oral complaint. (The initial complaint was made to the state agency in 1963.) The plaintiff thus failed to comply with 42 U.S.C. § 2000e–5(d). The *Love* case, however,

is distinguishable from the present case since it involved an oral reopening of previous state proceedings and dealt with § 2000e–5(d) rather than § 2000e–5(b). The case does, on the other hand, provide some guidance for this case. The district court's determination that the oral complaint to the state agency, while not literally complying with the Colorado statute, constituted substantial compliance was not disturbed by the circuit court. In addition, the circuit court wrote:

"The Civil Rights Act of 1964 is precise in its requirements that the States with adequate statutes and machinery have the first opportunity to consider complaints. This first opportunity is a clear requirement in the sequences set out in the Act." 430 F. 2d at 53.

The court then held that the EEOC could not assume automatic jurisdiction and bypass the state agency. In this case, the Utah state agency was afforded the first opportunity to consider the complaint. Plaintiff met immediately with Poulson and Adams, giving them the details of her discharge. Still, Poulson's conflict of interest prevented full investigation of the complaint. Even if plaintiff had brought a signed and verified written complaint with her to the first meeting with Poulson, the conflict would still have prevented adequate investigation.[2] Further, plaintiff apparently complied with all of Poulson's instructions, although there is an unexplained delay between her receipt of the proposed complaint and her execution thereof.

■ Moreover, since Title VII is remedial, its purpose of eliminating discriminatory employment practices ought not to be frustrated by strict construction,[3] and especially the procedural provi-

---

2. Even if we treated the oral complaint as insufficient to constitute commencement of the state proceedings, Poulson's conflict of interest rendered the state remedies ineffectual. It is established that where resort to administrative remedies would be wholly fruitless, plaintiff's failure to exhaust such remedies does not bar judicial review of the claim. Glover v. St. Louis-S.F.R. Co., 393 U.S. 324, 329–331, 89 S.Ct. 548, 21 L.Ed.2d 519 (1969).

3. *See* Culpepper v. Reynolds Metals Company, 421 F.2d 888, 891 (5th Cir. 1970).

sions ought not to be stumbling blocks where the plaintiff has not been dilatory.[4] Plaintiff manifestly fulfilled the requirement that she "commence" state proceedings first, and she ought not to be held responsible for the actions of a state agency over which she had no control.[5]

### Filing Suit in Federal Court

■ The second jurisdictional issue is whether 42 U.S.C. § 2000e–5(e) requires suit to be filed within ninety days after filing a complaint with the EEOC. The courts have clearly held that the only prerequisites to the filing of a suit under § 2000e–5(e) are: (1) filing a timely charge with the EEOC, and (2) filing suit within thirty days after receipt of notice from the EEOC of the right to file suit.[6] Plaintiff has met both requirements. The contention that a plaintiff must file suit within ninety days after filing with the EEOC has been rejected by the circuit courts.[7] The following language from Choate v. Caterpillar Tractor Co., 402 F.2d 357 (7th Cir. 1968), explains why defendant's contention must be rejected:

"Although certain time limits affirmatively appear in the Act, e. g., ninety days to file the charge, sixty days for the Commission to attempt voluntary compliance, and thirty days to file suit after notice from the Commission, the time period within which the Commission must notify the complainant after its attempt to obtain a voluntary compliance is nowhere prescribed. Consequently, the statute contains no definite overall time limitation which would bar the instant suit.

Moreover, a complainant has no control over the speed of the Commission's attempt to effect voluntary compliance or its promptness in sending the required notification after such undertaking has failed. Consequently, we believe that a complainant should not be made to suffer innocently for administrative delays for which he is not responsible." *Id.* at 361.

Defendant argues further that under EEOC rules plaintiff could have demanded notice from the EEOC. Plaintiff, however, was not required to demand such notice.

The court holds that all jurisdictional prerequisites have been met.

## REASON FOR PLAINTIFF'S DISCHARGE

Plaintiff charges that she was fired because she refused to falsify a minority race applicant's test score as requested by a supervisor and that this violates Title VII of the Civil Rights Act of 1964, which declares:

"It shall be an unlawful employment practice for an employer to discriminate against any of his employees * * because he has opposed any practice made an unlawful employment practice by this subchapter * * *." 42 U.S.C. § 2000e–3(a).

4. See McQueen v. E.M.C. Plastic Company, 302 F.Supp. 881 (E.D.Tex.1969); Sanchez v. Standard Brands, Inc., 431 F. 2d 455 (5th Cir. 1970).

5. See Quarles v. Philip Morris, Inc., 271 F.Supp. 842, 846–847 (E.D.Va.1967).

6. Beverly v. Lone Star Lead Const. Corp., 437 F.2d 1136 (5th Cir. 1971); Flowers v. Local No. 6, Laborers International Union of North America (AFL–CIO), 431 F.2d 205 (7th Cir. 1970); Fekete v. United States Steel Corp., 424 F.2d 331 (3rd Cir. 1970); Miller v. International Paper Co., 408 F.2d 283 (5th Cir. 1969); Choate v. Caterpillar Tractor Co., 402 F.2d 357 (7th Cir. 1968).

7. Choate v. Caterpillar Tractor Co., 402 F.2d 357 (7th Cir. 1968); Dent v. St. Louis-S.F.R. Co., 406 F.2d 399 (5th Cir. 1969); Miller v. International Paper Co., 408 F.2d 283 (5th Cir. 1969); Johnson v. Seaboard Air Lines Railroad Co., 405 F.2d 645 (4th Cir. 1968), cert. denied, Pilot Freight Carriers, Inc. v. Walker, 394 U.S. 918, 89 S.Ct. 1189, 22 L.Ed.2d 451 (1969); Cunningham v. Litton Industries, 413 F.2d 887 (9th Cir. 1969); Stebbins v. State Farm Mutual Automobile Ins. Co., 134 U.S.App.D.C. 193, 413 F.2d 1100 (1969) (dictum), cert. denied, 396 U.S. 895, 90 S.Ct. 194, 24 L.Ed.2d 173 (1969); Rosen v. Public Service Electric & Gas Co., 409 F.2d 775 (3rd Cir. 1969).

Defendant, on the other hand, maintains that plaintiff was discharged simply because of "inability to get along with employees under her jurisdiction and with her supervisor and department heads." The issue is whether plaintiff has shown by a fair preponderance of the evidence that her refusal to engage in an unlawful employment practice was the principal reason for her discharge.[8] It need not be the sole reason since such matters are almost always complicated and based on several reasons. The court concludes that plaintiff has met this burden.

■ In a case such as this, the trier of fact determines the reasons for an employee's discharge based on "reasonable inferences drawn from the totality of facts, the conglomerate of activities, and the entire web of circumstances presented by the evidence on the record as a whole." Aeronca Manufacturing Company v. N.L.R.B., 385 F.2d 724, 727–728 (9th Cir. 1967). In examining the evidence, the court considers first the racial attitudes at defendant's Salt Lake Office, second, the events surrounding plaintiff's discharge, and third, arguments made by counsel concerning the facts.

*Racial Attitudes*

The record indicates that some racial discrimination did exist at American Oil at the time when it was formerly Utah Oil. Poulson recounted that the President of Utah Oil had told him he should be happy not to have to work with "Niggers and Spicks and people of that sort." No Negroes had in fact been hired by defendant in Utah prior to October, 1966. The significance of defendant's failure to hire Negroes in Utah may be minimal since few Negroes live in Utah.[9] However, Mr. Olsen, the supervisor who assertedly asked plaintiff to discriminate against a Negro applicant, had been employed from the time when American Oil was "per se, Utah Oil," and Mr. Duch, Manager of Employee Relations at defendant's Salt Lake Office, told Mr. Poulson that Olsen did not want a Negro in his department.

■ American Oil's Salt Lake office became the regional office for Utah, Colorado, Montana, Wyoming, New Mexico, and Washington. According to defendant's statistics, only one member of a minority race was employed in the region as of January, 1965, and at the end of 1966 defendant employed 773 people in the region—but no Negroes and only seven members of other minority races. When a large company in an area with a diverse population hires no Negroes, although it hires new employees regularly and has standard job requirements, an inference of discrimination is reasonable.[10] Such an inference depends upon the diversity of the population in the region, but no census figures have been provided for the states other than Utah.

American Oil's stated policy regarding the hiring of minorities was:

"We believe in the dignity and worth of man, and are convinced that personnel decisions based on merit alone will result in the most effective work force.

8. See Barnes v. Lerner Shops of Texas, Inc., 323 F.Supp. 617, 620 (S.D.Tex. 1971); Dewey v. Reynolds Metals Co., 429 F.2d 324, 328 (6th Cir. 1970), cert. granted 400 U.S. 1008, 91 S.Ct. 566, 27 L.Ed.2d 621 (1971).

9. 1970 census figures show that Utah has only 6,617 Negroes or 0.62% of a population of 1,059,273. Salt Lake County, with a population of 458,607, has only 2,473 Negroes representing 0.53% of the population. The number of employable Negro women in Salt Lake County (ages 15 to 64) is 672 or 0.14% of the population. The number of Negro men in the same age bracket is 777 or 0.16% of the population. (Defendant's Reply Brief, p. 8.) However, it should be noted that the percentages would be larger if the numbers of Negroes were compared with the available non-Negro working force rather than the general population.

10. See United States v. Sheet Metal Workers, Intern. Ass'n Local Union No. 36, 416 F.2d 123 (8th Cir. 1969); Jones v. Lee Way Motor Freight, Inc., 431 F.2d 245 (10th Cir. 1970) cert. denied, 401 U.S. 954, 91 S.Ct. 972, 28 L.Ed.2d 237 (1971); Parham v. Southwestern Bell Telephone Co., 433 F.2d 421 (8th Cir. 1970).

Therefore, our policy is to treat each applicant for employment and each employee on his individual merit—without regard to considerations of race, religion, national origin, age and sex."

Defendant concedes that this statement alone does not show the company's actual practice, but it contends that the record shows its intent to implement the policy. Defendant seeks support for its contention from the following: Mr. Danielson, Regional Vice President, was the first top management man from outside Utah Oil. He testified that when he arrived in Salt Lake City in 1965 he was dissatisfied with the region's performance in hiring members of minority races and took steps to solve the problem. Mr. Poulson testified that the change in management brought a change in attitude and that *at present* defendant is making a bona fide attempt at hiring minorities. Testimony was given that in 1969 23% of those hired in the Salt Lake Office were "minority race people" and that this was increased to 35% in 1970. While this may *now* be an admirable effort on defendant's part, we are concerned only with the attitude and atmosphere present at the time of plaintiff's discharge. Furthermore, the testimony mentioned does not reveal whether any of the minority race members hired were Negroes and the 1969–1970 statistics are not contemporary to plaintiff's discharge at all.

Defendant also had a special hiring procedure for minority race applicants. Plaintiff testified that a white applicant who passed the key punch test was sent directly to Personnel, but the supervisors wanted to be notified of applications by minority race members immediately. In addition, a minority race applicant was also to be interviewed by Mr. Duch, Manager of Employee Relations, although this was not the case for a non-minority race applicant.

Defendant characterizes this hiring procedure as: (a) set up to protect the rights of minorities, (b) an implementation of the company's announced racial policy, and (c) legally or at least morally required "affirmative action."

The issue here, however, is not whether the hiring procedure was discriminatory. Plaintiff does not (nor can she) contend that *she* was discriminated against by this hiring practice, even though her counsel argues that the procedure is "tantamount to an overt act of discrimination based on race." The infirmity of defendant's hiring procedure for minority applicants is that it provides an opportunity for discrimination by the supervisors—e. g. Olsen, who did not want a Negro in his department. Such a hiring procedure is part of a setting that would allow unlawful employment practices to occur.

*Events Surrounding Plaintiff's Discharge*

Plaintiff was hired by defendant in 1961 as Chief Key Punch Operator in the Tabulating Section of the Machine Operations Division in the Salt Lake City Office. She supervised about seven girls, programming and scheduling their work. When she was hired she was told that her job would be difficult and she would not be popular because she would need to change the girls' ways to get effective work.

Plaintiff left her job in 1964 and again in 1965 to bear children. On her return to work after each pregnancy, objections were raised by some of the other key punch operators. However, her supervisors decided to bring her back to work because she could get the work accomplished. A meeting was held in April, 1966, to air out complaints against plaintiff.

Consolidation of defendant's accounting offices in Salt Lake City for several western states greatly increased the workload in the Key Punch Section during the summer of 1966. The girls in the key punch department did not enjoy working overtime and made their complaints against plaintiff since she was responsible for arranging the extra overtime.

Since there were so many supervisors involved in plaintiff's dismissal their relationships to each other are important. In practice, plaintiff was in charge of the Key Punch Section. Mr. Ipsen and Mr. Ringwood supervised the Tabulating Section and had some authority over plaintiff at times. Plaintiff's supervisor was Mr. Christensen. Mr. Rowell was the Assistant Regional Accounting Manager, and Mr. Olsen was the Regional Accounting Manager with authority to hire and fire employees. After Olsen came Mr. Crozier, Regional Administrative Manager and then Mr. Danielson, Regional Vice President and Manager of the Salt Lake Office.

The events of the following twelve days led to plaintiff's complaint before the Utah Anti-Discrimination Division:

*Friday, October 14, 1966:*

Christensen and Ringwood met concerning a backlog of key punch work and the need to bring in additional help. Ringwood suggested bringing in Montez Butterfield, and Christensen said this would cause trouble because plaintiff did not consider her a good worker. The matter was left up to Ringwood.

*Monday, October 17:*

Christensen was on vacation this week. In the afternoon, Rowell, Ipsen, Ringwood and Olsen met concerning the backlog of work. Ringwood suggested bringing in Montez Butterfield and advised Olsen of the possible complications. Olsen then instructed Ringwood to contact Butterfield and told Ipsen to inform plaintiff of the arrangement. This was apparently a departure from the usual procedure where plaintiff scheduled the machines and hired such casual help through Kelly Girl Services.

*Tuesday, October 18:*

Ipsen testified that he spoke with plaintiff in the morning and told her that Butterfield was coming to work. Plaintiff replied that Butterfield would not be working for her, Ipsen said she would, and plaintiff stormed off. Rowell also testified that he spoke with plaintiff about Butterfield on this day. He made a memo of this because he foresaw trouble.

Plaintiff, however, denied having these conversations on Tuesday, testifying that they occurred on Wednesday afternoon. At any rate, there is no evidence that plaintiff was told when Butterfield would be coming in so that a key punch machine could be scheduled for her.

*Wednesday, October 19:*

In the late afternoon, Ringwood and Ipsen informed plaintiff that Butterfield would be in that evening. Plaintiff replied that no machines were available since she always scheduled them eight hours in advance. There was a heated exchange between plaintiff and Ringwood, after which plaintiff testified she then went and discussed the matter with Rowell. Since not enough operators came in that evening, Butterfield worked five hours that night.

*Thursday, October 20:*

The events of this day are harshly disputed. On this day, Mrs. June Scales, a Negro employment applicant, arranged with plaintiff to take a key punch test at noon. Plaintiff testified that she informed Ipsen and Rowell that Mrs. Scales was going to take the test and received the following responses: Ipsen said he was hopeful that the Negro would not apply for employment, as he did not want to get involved, and Rowell told her he did not want anyone else to know Mrs. Scales' test results, but wanted them brought directly to him.

Sometime between 11:00 and 11:30 a. m., Ringwood came to work and spoke with Rowell about his altercation with plaintiff, threatening to quit unless something were done about it. Thereafter Rowell reported Ringwood's complaint to Olsen. Rowell testified at trial that Olsen told him at this time that plaintiff was all through, though in a previous affidavit he said plaintiff's termination had been decided a day or two before. In a company report about plaintiff, Mr. Duch reported that the Rowell-Ringwood conversation took place on Friday morning, but he admitted at trial that the report could be incorrect.

At noon Mrs. Scales came to defendant's office, took the key punch test and filled out an application while the results of the test were checked. She did very well on the test, punching 110 cards with no errors. Plaintiff stated that she then arranged for Mrs. Scales to return the following morning to take the "usual preliminary tests." Duch gave conflicting testimony that he interviewed Mrs. Scales between 12:15 and 12:30, going over her application, discussing the company's interest in hiring minorities, and giving her a job subject to the physical examination. Duch claimed to remember this because he missed his lunch and wrote the date on the application. However, in the company report he stated that he interviewed Mrs. Scales after she passed the "usual preliminary tests" (the Wonderlic and Minnesota Clerical) which Mrs. Scales did not take until Friday morning. I conclude that Mrs. Scales was not hired this day.

Plaintiff called Rowell right after lunch (about 12:30) to tell him the test scores, and then they went to see Olsen about Mrs. Scales. At that meeting, plaintiff contends Olsen asked her to go to Personnel and try to find three qualified whites to fill the vacancies. Defendant points to other testimony by plaintiff that this request was made earlier. I believe plaintiff's testimony that at some time that day Olsen asked her to find three whites to fill the vacancies.

The evidence concerning the rest of the afternoon is somewhat confusing. There was purportedly a meeting in Olsen's office of Olsen, Ipsen and Rowell between 1:00 and 2:00 in the afternoon. At that meeting Ipsen recounted the Butterfield incident and other problems concerning plaintiff were discussed. Rowell could not recall specific statements made by Olsen concerning terminating plaintiff, but Ipsen testified that Olsen said she ought to be terminated. There was also testimony that they decided to call Duch for advice.

Plaintiff testified that at the afternoon break (about 2:00) Olsen called her into his office. He was upset because

Mrs. Scales, a Negro, had qualified. He asked plaintiff to disqualify the application, but she refused. Olsen denied this unequivocally in two affidavits taken before his death. Curiously, Mr. Dunstan (an EEOC investigator) testified that after Olsen signed the second affidavit, which corrected the first, he asked what the consequences would be if he had told plaintiff to disqualify Mrs. Scales. More significantly, on deposition Poulson testified that Duch told him "he had hired Mrs. Scales in spite of the fact that she was not supposed to have been hired according to Mr. Olsen." I am convinced that the private conversation with Olsen took place as plaintiff claims.

At some indefinite time Olsen went to Danielson's office concerning plaintiff's termination. Then between 2:30 and 3:-00 Olsen called Duch, informing him that he had spoken with Danielson and had decided to terminate plaintiff's employment. There is also testimony that Olsen called Christensen at his home in the afternoon and Christensen approved plaintiff's termination because he was tired of the problems between her and Ringwood. The times given for all these events are not very reliable and I conclude that Olsen asked plaintiff to disqualify Mrs. Scales before the decision to terminate plaintiff.

*Friday, October 21:*

In the morning Olsen, Rowell, Ipsen and Duch met to review plaintiff's situation. Olsen favored outright discharge, but Duch suggested offering her two weeks' pay if she voluntarily resigned. Thereafter, plaintiff met with Olsen and Duch and was informed of her choice between resigning and being discharged. Plaintiff said she tried to get Olsen to tell Duch the reason for her termination, but threats were made against her and her husband's employment and she therefore made no reference to Olsen's request that she disqualify Mrs. Scales. Duch denied the threats, but said he offered to give plaintiff references, which he subsequently did.

After the meeting, plaintiff either asked or was asked to pick up her things

and leave. She wrote a note to a deaf mute employee and then tore it up and threw it in the wastebasket. The note was later retrieved and placed in plaintiff's file at American Oil.

On Friday afternoon, plaintiff called Mr. Crozier, the Regional Administrative Manager, but he refused to discuss her discharge. Plaintiff then went to the State Employment Security Office to inquire about her chances of obtaining unemployment compensation if she voluntarily resigned. That same afternoon a friend referred her to Henry Adams, an Assistant Attorney General associated with Utah's Anti-Discrimination Division.

*Sunday, October 23:*

Plaintiff spoke with Henry Adams and arranged an appointment at the Anti-Discrimination Office on the following Tuesday.

*Monday, October 24:*

In the morning plaintiff went to see Duch and told him she chose to be discharged. Duch stated that she said she had decided not to resign on "advice of counsel," and that she was out to "get Olsen." Plaintiff, however, denied making threats against Olsen. When Duch asked what reason plaintiff would use to explain her termination, she replied that it would be the excessive overtime demanded. Plaintiff was given a termination slip which gave the following reason for her discharge: "Inability to get along with employees under her jurisdiction and with her supervisors and department heads."

In the afternoon plaintiff applied for unemployment compensation at the state office and prepared a statement relative to her employment at American Oil. She testified that she made no mention of the Scales incident in the statement because she had insufficient proof and was trying to enhance her chances of obtaining new employment.

*Tuesday, October 25:*

Plaintiff met with Poulson and Adams at the Anti-Discrimination Office.

Plaintiff related American Oil's racial policy and the details of her private conversation with Olsen, among other things. Poulson recalled Mrs. Scales' name and that Olsen had told plaintiff she would be well-advised not to hire Mrs. Scales. Poulson testified that plaintiff related that she was discharged because she had approved a Negro's application against the direction of her supervisor.

Thereafter Poulson made a meager effort to effect a conciliation without requiring the filing of a formal complaint. Mrs. Scales was hired and worked from November 7 to November 15, 1966, when she voluntarily resigned to return to Denver.

*Contentions of the Parties Concerning the Evidence*

There are numerous contradictions and discrepancies in the evidence submitted by both parties at trial. Each party has argued extensively in post-trial memoranda to discredit his opponent. The major confrontation is between plaintiff's testimony of her private conversation with Olsen and Olsen's two affidavits which unequivocally deny such a conversation. In the first affidavit Olsen denied having any conversation with plaintiff on October 20th concerning Mrs. Scales. The second affidavit resulted from finding that this did not agree with testimony by other employees and Olsen then stated he had not spoken with plaintiff privately. Unfortunately Olsen was not available at trial since he died on January 26, 1969. The inconsistent affidavits cast doubt on their trustworthiness.

Defendant also attacks plaintiff's testimony by maintaining that she had no independent recollection of the critical events, though she recalled earlier events quite clearly. And further, defendant complains that plaintiff used notes written four months after her discharge, but did not use her most contemporaneous notes.

Defendant attempts to capitalize on plaintiff's alleged omissions to mention Mrs. Scales or Negroes in various con-

versations and statements shortly after she was notified of her discharge. These incidents include: (a) No mention was made to Duch, though he was in charge of enforcing the company racial policy; (b) No mention was made to plaintiff's co-workers, Linda Quinn and Shirley Nielsen, in certain phone calls; (c) No mention was made of the separate interview with Olsen in the statement prepared for the Industrial Relations Department. However, such an omission does not compel the conclusion that the private conversation between plaintiff and Olsen did not occur. Plaintiff stated that at the time she prepared the statement she had insufficient proof and was mainly concerned with obtaining a new job. She did, in fact, relate Olsen's telling her not to hire Mrs. Scales to Mr. Poulson on the day after the statement was prepared. She also made a direct charge concerning her refusal to discriminate in the complaint drafted for her by Poulson and she made specific allegations against Mr. Olsen in her letter of December 27, 1966, to Mr. Swearingen, Chairman of the Board of Standard Oil of Indiana.

Defendant advances a similar argument with respect to plaintiff's testimony that threats were made against her and her husband's job. No mention was made of these threats in the report to the Industrial Relations Department, in plaintiff's deposition, or in her letter to the Chairman of the Board. It is not unreasonable that plaintiff omitted some of the details surrounding her termination on each of those occasions. For example, at the deposition she could only answer the questions put to her by counsel.

Defendant characterizes the Butterfield incident as the culmination of many problems with plaintiff and a clear indication of sufficient inability to get along with others as to justify her termination. However, the evidence does not show that the Butterfield incident carried such great weight. Even though some of the testimony shows that plaintiff was not easy to get along with, some of that can be attributed to her very as-

signment to get the women she supervised to do their jobs.

The plaintiff's difficulties with the girls under her supervision is fully explained by testimony the defendant company has not denied, namely: that she was told when she was hired that her job was to keep a tight rein on them, push them, keep them in line, and get the work out of them. She did just that. And in doing her employer's bidding, she incurred the wrath of women working under her.

Christensen, her immediate supervisor, said she was competent, qualified, a good worker, and she did her job as well as could be expected, although he did not think she got along well with people. He rated her excellent on the 1964 annual job review sheet, she was given a raise in 1965, and she participated in a company-wide promotion in 1966. Further, if plaintiff had been such a thorn in defendant's side as defendant would have us believe, it is amazing that Duch, whose job it was to handle such problems, never even met plaintiff until the day she was notified of her discharge.

In addition, defendant contends that the evidence examined as a whole fits "into a logical and consistent pattern showing the processes of why and how a large corporation goes about firing one of its employees." I am not convinced that this was such a routine firing. Olsen had the authority to hire and fire, but he called in nearly every other person in any supervisory capacity for consultation about the matter. Defendant replies that this was simply normal procedure, but there is no evidence that so many supervisors normally got together to discuss a termination. It is also strange that both Rowell and Duch anticipated trouble from a supposedly routine dismissal.

Plaintiff, however, does fail to explain the inconsistencies surrounding the so-called "Kelly Girl incident." Plaintiff testified that Mrs. Scales first inquired about employment through Kelly Girl Services in September, 1966. Upon finding that she was a Negro, plaintiff said

that Ipsen told her to cancel defendant's order with Kelly Girl, and she did so by speaking with one of the supervisors at Kelly Girl. Ipsen denied ever issuing such an order, and Mrs. Sparks of Kelly Girl testified that no such cancellation was ever received. Plaintiff's counsel attempted to rehabilitate plaintiff's story by suggesting that simply not placing further orders would effectively cancel the order. Nevertheless, the fact that Mrs. Sparks' husband is employed by defendant tends to discredit her testimony. These inconsistencies are not important enough to discredit plaintiff's other testimony.

■ I find that plaintiff's refusal to disqualify Mrs. Scales as requested by Mr. Olsen was the principal reason for her subsequent termination.

## DEFENDANT'S INTENT AND LIABILITY

■ Defendant argues in its post-trial memoranda that even if Olsen did ask plaintiff to disqualify Mrs. Scales and plaintiff was discharged for her refusal to do so, this was not communicated to the company and therefore neither Olsen's illegal intent nor acquiescence in his actions can be attributed to defendant. Such a contention is entirely without merit. The EEOC, in its "Post-trial Memorandum of Law," correctly states:

"When American Oil gave its Regional Accounting Manager authority to fire employees, it also accepted responsibility to remedy any harm caused by his unlawful exercise of that authority. The modern corporate entity consists of the individuals who manage it, and little, if any, progress in eradicating discrimination in employment will be made if the corporate employer is able to hide behind the shield of individual employee action." (p. 6)

In addition, defendant's citation of Barney v. Jewel Tea Co., 104 Utah 292,

139 P.2d 878 (1943); Boeing Airplane Co. v. N.L.R.B., 140 F.2d 423 (10th Cir. 1944) and N.L.R.B. v. Shenandoah-Dives Mining Co., 145 F.2d 542 (10th Cir. 1944), has no relevance to the present case. The *Barney* case deals with rules of agency for a common law tort. The other cases deal with responsibility for anti-union statements violating the National Labor Relations Act—the court finding no responsibility because no harm was done.[11]

## DAMAGE AWARD

The last issue concerns the amounts and types of damages to be awarded. The federal statute grants the court power to "order such affirmative action as may be appropriate," and to allow the prevailing party "a reasonable attorney's fee as part of the costs." 42 U.S.C. §§ 2000e–5(g) and 2000e–5(k). As was stated in Bowe v. Colgate-Palmolive Co., 416 F.2d 711 (7th Cir. 1969):

"This grant of authority [§ 2000e–5 (g)] should be broadly read and applied so as to effectively terminate the practice and make its victims whole. * * * The full remedial powers of the court must be brought to bear and all appropriate relief given." *Id.* at 721

Plaintiff in this case does not seek reinstatement but requests the following: (a) Back pay with interest at 6% from the date of termination to the date of trial; (b) The contributions defendant would have made to a group life insurance plan and company savings and retirement plan; (c) A reasonable attorney's fee and costs; and, (d) Correction of the termination slip on file with the Utah State Employment Security Office. Defendant concedes that back pay may be awarded without reinstatement but contends that its obligation for back pay ceased on December 13, 1968, when plaintiff filed suit seeking damages without reinstatement. Defendant argues in

---

11. *Boeing* and *Shenandoah* also have doubtful validity in view of Furr's, Inc. v. N.L.R.B., 350 F.2d 84 (10th Cir. 1965) where the court found the employer responsible in a fact situation nearly identical to the one in *Boeing*.

the alternative that its obligation ceased as of July, 1969, when plaintiff moved to Tucson, Arizona. Defendant also contends that all unemployment compensation benefits received by plaintiff should be deducted from the award.

Defendant cites Lea v. Cone Mills Corp., 438 F.2d 86 (4th Cir. 1971), for the proposition that plaintiff's failure to seek reinstatement in this suit should bar recovery from the date of filing. However, in that case the court of appeals simply upheld the district court's decision to deny back pay because plaintiffs' primary motives were to test employment practices rather than to seek actual employment. Plaintiff in this case is not simply testing defendant's employment practices. There is no indication that Congress intended to distinguish between those seeking reinstatement and those seeking other damages.

With regard to plaintiff's move to Arizona in 1969, defendant argues that the major reason for the move was plaintiff's husband's loss of employment and that she therefore left the vicinity for reasons unrelated to seeking employment. However, plaintiff testified that the move was also coupled with her own inability to find work in the Salt Lake area. Defendant relies on Mastro-Plastics Corp., 145 N.L.R.B. 1710 (1964), where back pay was denied because the claimant left the vicinity of the labor market for a reason unrelated to seeking employment. The National Labor Relations Board made it clear, however, that a claimant may seek a job beyond the vicinity of the labor market and still be entitled to back pay. Both plaintiff and her husband sought work upon their move to Arizona, and therefore, I see no reason why plaintiff's move to Arizona should reduce the award of damages.

The purpose of Title VII is to put the aggrieved party in the same position he would have been but for the defendant's illegal interference with the employer-employee relationship. Therefore, I find that the back pay award should include the 6% interest requested. Such a result was affirmed in N.L.R.B. v. American Compress Warehouse, 374 F.2d 573 (5th Cir. 1967), because the payment of interest brings "a restoration of the situation, as nearly as possible, to that which would have obtained, but for the illegal discrimination." Id. at 575. For the same reason, plaintiff should also recover the contributions defendant would have made to the group life insurance plan and the company savings and retirement plans.[12]

Defendant raises the further question of whether unemployment benefits should be deducted from the award. In Bowe v. Colgate-Palmolive Co., 416 F.2d 711, 721 (7th Cir. 1969), the court found that deducting such benefits was proper as a valid exercise of the trial court's discretion. However, I find the reasoning in N.L.R.B. v. Gullett Gin Co., 340 U.S. 361, 71 S.Ct. 337, 95 L.Ed. 337 (1950), persuasive. In that case the Supreme Court held that the N.L.R.B. had power to award back pay without deducting unemployment compensation, stating:

"To decline to deduct state unemployment compensation benefits in computing back pay is not to make the employees more than whole, as contended by respondent. Since no consideration has been given or should be given to collateral losses in framing an order to reimburse employees for their lost earnings, manifestly no consideration need be given to collateral benefits which employees have received." Id. at 364, 71 S.Ct. at 339.

12. The right to back pay has been held to include benefits which would have been received but for the discriminatory acts. See Bowe v. Colgate-Palmolive Co., 272 F.Supp. 332 (S.D.Ind.1967), modified and remanded, 416 F.2d 711 (7th Cir. 1969); Nabors v. N.L.R.B., 323 F.2d 686 (5th Cir. 1963) cert. denied, 376 U.S. 911, 84 S.Ct. 666, 11 L.Ed.2d 609 (1964), (profit shares, Christmas gifts and other gratuitous amounts included in back pay award). See also Local 186, International Pulp, Sulphite and Paper Mill Workers v. Minnesota Mining and Manufacturing Co., 304 F.Supp. 1284 (N.D. Ind.1969).

I therefore decline to deduct such compensation from plaintiff's award. However, all earnings by plaintiff during the period in question shall be deducted.

I also find that plaintiff is entitled to a reasonable attorney's fee and costs. Plaintiff's counsel have already presented evidence and argument in several briefs concerning the award of attorney's fees. Defendant is given fifteen days to respond to plaintiff's briefs, after which time I shall determine the reasonable amount.

An order correcting the plaintiff's termination notice issued by defendant and filed with the Utah Department of Employment Security shall be drafted by plaintiff's counsel and submitted for issuance by the court.