Paulette L. BARNES, Appellant,

v.

Douglas M. COSTLE, Administrator of the Environmental Protection Agency.

No. 74–2026.

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 17, 1975.

Decided July 27, 1977.

---

Linda R. Singer, Washington, D. C., with whom Ronald L. Goldfarb, Washington, D. C., was on the brief, for appellant.

Michael A. Pace, Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert, U. S. Atty., John A. Terry, Peter R. Reilly, Mary-Elizabeth Medaglia, Asst. U. S. Attys., and James F. McMullin, Asst. U. S. Atty., at the time the brief was filed, Washington, D. C., were on the brief, for appellee.

Before BAZELON, Chief Judge, and ROBINSON and MacKINNON, Circuit Judges.

Opinion for the Court filed by SPOTTS-WOOD W. ROBINSON, III, Circuit Judge.

Concurring Opinion filed by MacKINNON, Circuit Judge.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

This appeal launches a review of an order of the District Court awarding a summary judgment to appellee[1] on the ground that Title VII of the Civil Rights Act of 1964,[2] as amended by the Equal Employment Opportunity Act of 1972,[3] does not offer redress for appellant's complaint that her job at the Environmental Protection Agency was abolished because she repulsed her male superior's sexual advances.[4] We reverse.

I

Appellant, a black woman, was hired by the director of the Agency's equal employment opportunity division, who also is black, as his administrative assistant at grade GS–5. During a pre-employment interview, she asserts, he promised a promotion to grade GS–7 within ninety days.

1. Appellee is the Administrator of the Environmental Protection Agency, at which the events precipitating this lawsuit allegedly transpired. He is a litigant solely by reason of his official position.

2. Pub. L. No. 88–352, tit. VII, 78 Stat. 253 (1964), as amended, 42 U.S.C. §§ 2000e et seq. (1970).

3. Pub. L. No. 92–261, 86 Stat. 103 (1972), as amended, 42 U.S.C. §§ 2000e et seq. (Supp. II 1972).

4. Barnes v. Train, Civ. No. 1828–73 (D.D.C.) (order of Aug. 9, 1974).

Shortly after commencement of the employment, she claims, the director initiated a quest for sexual favors by "(a) repeatedly soliciting [her] to join him for social activities after office hours, notwithstanding [her] repeated refusal to do so; (b) by making repeated remarks to [her] which were sexual in nature; (c) by repeatedly suggesting to [her] that if she cooperated with him in a sexual affair, her employment status would be enhanced." [5] Appellant states that she "continually resisted [his] overtures . . . and finally advised him that notwithstanding his stated belief that many executives 'have affairs with their personnel', she preferred that their relationship remain a strictly professional one." [6] Thereafter, she charges, the director "alone and in concert with other agents of [appellee], began a conscious campaign to belittle [her], to harrass her and to strip her of her job duties, all culminating in the decision of [appellee's] agent . . to abolish [her] job in retaliation for [her] refusal to grant him sexual favors." [7]

These activities, appellant declares, "would not have occurred but for [her] sex." [8]

After seeking unsuccessfully an informal resolution of the matter, appellant, acting *pro se*, filed a formal complaint alleging that the director sought to remove her from his office when she "refused to have an after hour affair with" him.[9] The complaint charged discrimination based on race rather than gender,[10] a circumstance which appellant attributes to erroneous advice by agency personnel.[11] A hearing on the complaint was conducted by an appeals examiner, who excluded proffered evidence of sex discrimination and found no evidence of race discrimination.[12] In its final decision, the Agency concurred in the examiner's finding.[13]

Appellant then obtained counsel and appealed to the Civil Service Commission. There, appellant's attorney requested the Board of Appeals and Review to reopen the record to enable the presentation of sex-discrimination evidence.[14] The Board, how-

---

5. Joint Appendix (J.App.) 29 (appellant's complaint ⁋ 5).

6. J.App.29 (appellant's complaint ⁋ 6).

7. J.App.29 (appellant's complaint ⸀ 6). The position appellant held was eliminated and replaced by a grade GS–12 position filled by a white woman, and appellant was reassigned as a grade GS–5 employee elsewhere in the Agency.

8. J.App.29 (appellant's complaint ⁋ 6).

9. J.App.1.

10. J.App.1.

11. J.App.30 (appellant's complaint ⁋ 7). The claim here is that agency personnel told appellant that the matter was solely a personnel grievance and did not amount to sex discrimination. See note 14 infra.

12. J.App.5–20. Nonetheless, some evidence of sex discrimination crept into the hearing. Another female employee of the Agency testified to problems with the director when she refused to engage in sexual relations with him. J.App. 91–93. With respect to this allegation and others, the director testified differently at the hearing. These contrasting versions are unimportant at this stage of the litigation. As we later point out, the District Court erroneously denied appellant's request for a trial de novo and ren-

dered summary judgment exclusively on the administrative record. See note 18 infra. The conflicting testimony at the administrative hearing merely paralleled the same factual disputes later generated by the pleadings—disputes foreclosing summary judgment. Fed.R. Civ.P. 56(c).

13. J.App.3–4.

14. Counsel informed the Board that subsequent to the hearing a pattern of discriminatory promotion of men as opposed to women had developed under the director's regime. J.App.24. Counsel also told the Board that

[appellant] was incorrectly advised as to the laws of sex discrimination by the agency EEO counsellor who assisted her in filing her complaint of race discrimination in this case

. . .

[Appellant] litigated her case on the basis of alleged race discrimination only, omitting from her presentation on the grounds of relevancy a considerable amount of evidence which at least arguably would have supported the claim of sex discrimination. . . I submit that this case involves an erroneous interpretation of the law justifying reopening the record. . . . Moreover, it is appropriate as a matter of fairness and charity . . . to reopen the record where evidence is adduced in the course of hearing which would support a claim of discrimina-

ever, affirmed the agency's negative finding on race discrimination and refused the request to reopen on the ground that appellant's allegations did not bring the case within the purview of the Commission's regulations implementing Title VII.[15]

Thereafter, appellant filed her complaint in the District Court, confining her theory, by allegations to which we have averted,[16] to sex discrimination violative of Title VII and the Fifth Amendment.[17] The court, limiting the inquiry to reexamination of the administrative record,[18] granted appellee's motion for summary judgment in the view that "the alleged discriminatory practices are not encompassed by the Act."[19] The "alleged retaliatory actions of [appellant's] supervisor taken because [appellant] refused his request for an 'after hour affair,'" the court held, "are not the type of discriminatory conduct contemplated by the 1972 Act."[20] The court reasoned:

> The substance of [appellant's] complaint is that she was discriminated against, not

because she was a woman, but because she refused to engage in a sexual affair with her supervisor. This is a controversy underpinned by the subtleties of an inharmonious personal relationship. Regardless of how inexcusable the conduct of [appellant's] supervisor might have been, it does not evidence an arbitrary barrier to continued employment based on [appellant's] sex.[21]

The appeal to this court then followed.

## II

By adoption of Title VII of the Civil Rights Act of 1964,[22] Congress made it an unlawful employment practice for nongovernmental employers, with exceptions not presently relevant,[23] "to . . . discriminate against any individual with respect to his . . . terms, conditions, or privileges of employment, because of such individual's . . . sex . . . ."[24] Unfortunately, the early history of that legislation

tion on a basis other than that which was originally alleged.

15. J.App.21–26.

16. See text *supra* at notes 5–8.

17. *Barnes v. Train, supra* note 4. The complaint sought (a) a declaratory judgment that the director's actions constituted sex discrimination within Title VII, (b) back pay, (c) reconstruction of her personnel records to reflect the promotions she would have received but for the allegedly unlawful acts, (d) compensation for expenses incurred in prosecuting the case administratively, (e) medical expenses incurred for treatment of nervous anxiety caused by the incidents complained of, and (f) costs and attorney's fees. J.App.31–32.

18. Appellant sought leave to amend the complaint to include allegations of retaliation by the director after the filing of the initial discrimination complaint. The record does not reflect any ruling on that request. See note 90 *infra*. The court held, however, that appellant was not entitled to a de novo trial, *Barnes v. Train, supra* note 4, memorandum opinion at 3–4 (Aug. 9, 1974), J.App.165–166, a ruling independently challenged on this appeal. It is now clear that if appellant's complaint stated a claim upon which relief could be granted pursuant to Title VII, the court erred in denying de novo consideration. *Chandler v. Roudebush*, 425 U.S. 840, 96 S.Ct. 1949, 48 L.Ed.2d 416 (1976), decided after rendition of the judgment appealed from. See also note 90 *infra*.

19. *Barnes v. Train, supra* note 4, memorandum opinion at 1 (Aug. 9, 1974), J.App.163.

20. *Id.* at 2, J.App.164.

21. *Id.* at 3, J.App.165.

22. Pub. L. No. 88–352, 78 Stat. 255 (1964), as amended, 42 U.S.C. §§ 2000e–2 *et seq.* (1970).

23. See note 83 *infra* and accompanying text.

24. In relevant part the Act provides:

> It shall be an unlawful employment practice for an employer—
> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
> (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

Civil Rights Act of 1964, tit. VII, § 703, as amended, 42 U.S.C. § 2000e–2(a) (1970 & Supp. II 1972).

lends no assistance to endeavors to define the scope of this prohibition more precisely, if indeed any elucidation were needed. It was offered as an addition to other proscriptions by opponents in a last-minute attempt to block the bill which became the Act,[25] and the bill, with the amendment barring sex-discrimination, then quickly passed.[26] Thus, for an eight-year period following its original enactment, there was no legislative history to refine the congressional language.

When, however, the 1964 Act was amended by the Equal Employment Opportunity Act of 1972,[27] there was considerable discussion on the topic. Not surprisingly, it then became evident that Congress was deeply concerned about employment discrimination founded on gender, and intended to combat it as vigorously as any other type of forbidden discrimination. The report of the House Committee on Education and Labor declared in ringing tones that the statute—eight years after passage—still had much to accomplish in order to elevate the status of women in employment: [28]

> Numerous studies have shown that women are placed in the less challenging, the less responsible and the less remunerative positions on the basis of their sex alone.
>
> Such blatantly disparate treatment is particularly objectionable in view of the fact that Title VII has specifically prohibited sex discrimination since its enactment in 1964.[29]

The Committee emphasized that women's employment rights are not "judicial divertissements," [30] and that "[d]iscrimination against women is no less serious than other forms of prohibited employment practices and is to be accorded the same degree of social concern given to any type of unlawful discrimination." [31] The report of the Senate Committee on Labor and Public Welfare reveals a similar commitment to eradication of sex discrimination: [32]

> While some have looked at the entire issue of women's rights as a frivolous divertissement, this Committee believes that discrimination against women is no less serious than other prohibited forms of discrimination, and that it is to be accorded the same degree of concern given to any type of similarly unlawful conduct. As a further point, recent studies have shown that there is a close correlation between discrimination based on sex and racial discrimination, and that both possess similar characteristics.[33]

Not unexpectedly, then, during the thirteen years since enactment of Title VII it has become firmly established that the Act invalidates all "artificial, arbitrary and unnecessary barriers to employment when the barriers operate invidiously to discriminate on the basis of . . . impermissible classification[s]." [34] Title VII has been invoked to strike down a wide variety of impediments to equal employment opportunity between the sexes, including insufficiently validated tests,[35] discriminatory se-

25. See 110 Cong.Rec. 2577 (1964) (remarks of Representative Smith); *id.* at 2581–2582 (remarks of Representative Green).

26. See 110 Cong.Rec. 2804–2805 (1964); *id.* at 14511; *id.* at 15897.

27. Pub.L. No. 92–261, 86 Stat. 103 (1972), 42 U.S.C. §§ 2000e *et seq.* (Supp. II 1972).

28. H.R.Rep. No. 92–238, 92d Cong., 1st Sess. 4–5, U.S.Code Cong. & Admin.News 1972, p. 2137 (1971).

29. *Id.*

30. *Id.* at 5.

31. *Id.*

32. S.Rep. No. 92–415, 92d Cong., 1st Sess. 7–8 (1971).

33. *Id.* at 7.

34. *Griggs v. Duke Power Co.,* 401 U.S. 424, 431, 91 S.Ct. 849, 853, 28 L.Ed.2d 158, 164 (1971).

35. *Griggs v. Duke Power Co., supra* note 34; *Rogers v. International Paper Co.,* 510 F.2d 1340, 1348 (5th Cir.), *vacated on other grounds,* 423 U.S. 809, 96 S.Ct. 19, 46 L.Ed.2d 29 (1975); *United States v. N. L. Indus., Inc.,* 479 F.2d 354, 371–372 (8th Cir. 1973).

niority systems,[36] weight-lifting requirements,[37] and height and weight standards solely for those of one gender.[38] Congress could hardly have been more explicit in its command that there be no sex-based discrimination "against any individual with respect to his . . . terms, conditions, or privileges of employment . . . ."[39]

The equal employment measures of the Civil Rights Act of 1964 did not apply to the Federal Government.[40] The amendments to Title VII effected by the Equal Employment Opportunity Act of 1972, however, extended the substantive protections of the 1964 Act to federal as well as state and local employees.[41] In the federal domain, the 1972 Act provides in relevant part that

[a]ll personnel actions affecting employees or applicants for employment . . . in executive agencies . . . shall be made free from any discrimination based on race, color, religion, sex or national origin.[42]

To be sure, the language of the 1964 Act in reference to private employees differs somewhat from that of the 1972 Act respecting federal employees. But it is beyond cavil that Congress legislated for federal employees essentially the same guarantees against sex discrimination that previously it had afforded private employees.[43] We thus proceed to an examination of appellant's claim with the assurance that anything constituting sex discrimination in private employment is equally interdicted in the federal sector.[44]

### III

Title VII now requires, *inter alia*, that "[a]ll personnel actions affecting employees . . . in [federal] executive agencies . . . shall be made free from any discrimination based on . . . sex . . . ."[45] It is not argued, nor plausibly could it be, that elimination of appellant's then position within the Environmental Protection Agency was not a "personnel action[]" within the contemplation of this provision.[46] Nor can it be doubted that the

**36.** *United States v. Bethlehem Steel Corp.*, 446 F.2d 652, 658–659 (2d Cir. 1971); *United States v. Chesapeake & O. Ry.*, 471 F.2d 582, 588–589 (4th Cir. 1972), *cert. denied*, 411 U.S. 939, 93 S.Ct. 1893, 36 L.Ed.2d 401 (1973); *Robinson v. Lorillard Corp.*, 444 F.2d 791, 799–800, 21 A.L.R.Fed. 453 (4th Cir.), *cert. dismissed*, 404 U.S. 1006, 92 S.Ct. 573, 30 L.Ed.2d 655 (1971); *United States v. N. L. Indus., Inc., supra* note 35, 479 F.2d at 366–367.

**37.** *Weeks v. Southern Bell Tel. & Tel. Co.*, 408 F.2d 228, 234–236, 12 A.L.R.Fed. 1 (5th Cir. 1969). *Cf. Rosenfeld v. Southern Pac. Co.*, 444 F.2d 1219, 1225–1227 (9th Cir. 1971).

**38.** *Laffey v. Northwest Airlines*, 366 F.Supp. 763, 790 (D.D.C.1974), *aff'd in part and reversed in part*, No. 74–1791 (D.C.Cir. Oct. 20, 1976). The Supreme Court has also outlawed height and weight strictures which, although applicable to both sexes, have a disproportionate impact on women. *Dothard v. Rawlinson*, —— U.S. ——, —— – ——, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977).

**39.** See text *supra* at note 24.

**40.** Civil Rights Act of 1964, tit. VII § 701(b)(1), 42 U.S.C. § 2000e(b)(1) (1970).

**41.** Equal Employment Opportunity Act of 1972, §§ 2(b)(1), 11(a), 42 U.S.C. §§ 2000e(b)(1), 2000e–16(a) (Supp. II 1972).

**42.** Pub.L. No. 92–261, § 11, 86 Stat. 111 (1972), 42 U.S.C. § 2000e–16 (Supp. II 1972).

**43.** See, *e. g., Dothard v. Rawlinson, supra* note 38, —— U.S. at —— n.14, 97 S.Ct. at 2728 n.14, 53 L.Ed.2d at 799 n.14; *Morton v. Mancari*, 417 U.S. 535, 547, 94 S.Ct. 2474, 2481, 41 L.Ed.2d 290, 298 (1974) ("[i]n general, it may be said that the substantive anti-discrimination law embraced in Title VII was carried over and applied to the Federal Government"); *Hackley v. Rodebush*, 171 U.S.App.D.C. 376, 404, 410 n.138, 416, 520 F.2d 108, 136, 142 n.138, 148 (1975); *Douglas v. Hampton*, 168 U.S.App.D.C. 62, 67, 512 F.2d 976, 981 (1975); *Womack v. Lynn*, 164 U.S.App.D.C. 198, 504 F.2d 267 (1974); *Parks v. Dunlop*, 517 F.2d 785, 787 (5th Cir. 1975).

**44.** "The intent of Congress in enacting the 1972 amendments to that Act extending its coverage to federal employment was to give those public employees the same rights as private employees enjoy." *Parks v. Dunlop, supra* note 43, 517 F.2d at 787. See also S.Rep. No. 92–415, 92d Cong., 1st Sess. 16 (1971).

**45.** See text *supra* at note 42.

**46.** It has been asserted, however, that "the alleged discrimination in the instant case was not a result of a policy, a regulation, or a statute," Brief for Appellee at 24, a matter we

action effected a "discrimination"—a difference in treatment—against appellant *vis-a-vis* other employees of the Agency, since there is no indication that the position of any other employee of the agency was similarly eliminated. The question debated, and the issue pivotal on this appeal, is whether the discrimination, in the circumstances described by appellant, was as a matter of law "based on . . . sex . . . ."[47]

We start with the statute as written, and, so measured, we think the discrimination as portrayed was plainly based on appellant's gender. Her thesis, in substance, is that her supervisor retaliated by abolishing her

job when she resisted his sexual advances. More particularly, she states that he repeatedly told her that indulgence in a sexual affair would enhance her employment status; that he endeavored affirmatively but futilely to consummate his proposition; and that, upon her refusal to accede, he campaigned against her continued employment in his department and succeeded eventually in liquidating her position.[48] So it was, by her version, that retention of her job was conditioned upon submission to sexual relations—an exaction which the supervisor would not have sought from any male.[49] It is much too late in the day to contend that Title VII does not outlaw

address later. See text *infra* at notes 71 and 72. We do not understand appellee to imply thereby that abolition of appellant's position, as distinguished from a sex bias underlying it, was unsupported by regulation or statute. Such a concession would, of course, be fatal to any effort to defend the abolition.

47. On the eve of rendition of our decision herein, appellee moved for a remand of the case to the District Court. The motion informs us that "[s]ince the date of oral argument" in this court "the Civil Service Commission . . . has reconsidered its position," and that "[i]t is now the Commission's view that the type of conduct alleged by appellant—conditioning employment benefits upon an employee's compliance with his or her supervisor's demands for sexual favors—if true, constitutes sex discrimination within the meaning of Title VII." Motion of Appellee to Remand (June 22, 1977), at 2. The motion argues that the District Court should be afforded the opportunity to re-examine its ruling in light of the Commission's present stand, and expresses the "view [that] the Commission's new position represents a reasonable construction of the statute and hence should be followed by the District Court." *Id.* at 2–3 (citation omitted).

We certainly agree that the interpretation now given Title VII by the Commission—the agency primarily responsible for administration of Title VII in the area of federal employment, see 42 U.S.C. § 2000e–16(b) (Supp. II 1972)—lends powerful support to the identical conclusion we have reached. *Griggs v. Duke Power Co., supra* note 34, 401 U.S. at 433–434, 91 S.Ct. at 854–855, 28 L.Ed.2d at 165; *United States v. City of Chicago,* 400 U.S. 8, 10, 91 S.Ct. 18, 20, 27 L.Ed.2d 9, 12–13 (1970); *Udall v. Tallman,* 380 U.S. 1, 4, 85 S.Ct. 792, 795, 13 L.Ed.2d 616, 619 (1965). That is not, however, to say that the remand which appellee desires is indicated. Judicial responsibility to construe the governing statute remains, see *Young v. United States,* 315 U.S. 257, 258–259, 62 S.Ct.

510, 511, 86 L.Ed. 832, 834–835 (1942); *cf. Sibron v. New York,* 392 U.S. 40, 58, 88 S.Ct. 1889, 1900, 20 L.Ed.2d 917, 932 (1968); *Petite v. United States,* 361 U.S. 529, 532, 80 S.Ct. 450, 452, 4 L.Ed.2d 490, 492–493 (1960) (concurring opinion); *Gibson v. United States,* 329 U.S. 338, 344 n. 9, 67 S.Ct. 301, 304 n. 9, 91 L.Ed. 331, 338 n. 9 (1946); and whether that duty should be discharged by the District Court or, rather, by this court comes down to a matter of adjudicative feasibility.

When appellee's motion to remand arrived, our resolution of the constructional problem had already crystallized, and we were prepared to overturn the holding of the District Court on that issue, as we do today. Moreover, there is no way of knowing whether the District Court would deem the Commission's changed interpretation sufficiently persuasive to warrant a reversal of the apparently firm conclusion to the contrary that it had earlier reached; and if it is not, a new appeal—with another heavy investment of time, labor and expense—presumably would follow. In these circumstances, we are unable to perceive adequate justification for the requested remand, and the motion therefore will be denied.

48. See text *supra* at notes 5–8.

49. The vitiating sex factor thus stemmed not from the fact that what appellant's superior demanded was sexual activity—which of itself is immaterial—but from the fact that he imposed upon her tenure in her then position a condition which ostensibly he would not have fastened upon a male employee. Appellant flatly claims that but for her gender she would not have been importuned, and nothing to the contrary has as yet appeared, and there is no suggestion that appellant's allegedly amorous supervisor is other than heterosexual. These are matters for proof at trial, and the inquiry at this stage of the litigation is solely in terms of a prima facie case of sex discrimination. In sum,

terms of employment for women which differ appreciably from those set for men,[50] and which are not genuinely and reasonably related to performance on the job.[51]

■ The District Court felt, however, that appellant's suit amounted to no more than a claim "that she was discriminated against, not because she was a woman, but because she refused to engage in a sexual affair with her supervisor."[52] In similar vein, appellee has argued that "[a]ppellant was allegedly denied employment enhancement not because she was a woman, but rather because she decided not to furnish the sexual consideration claimed to have been demanded."[53] We cannot accept this analysis of the situation charged by appellant. But for her womanhood, from aught that appears, her participation in sexual activity would never have been solicited.[54] To say, then, that she was victimized in her employment simply because she declined the invitation is to ignore the asserted fact

that she was invited only because she was a woman subordinate to the inviter in the hierarchy of agency personnel.[55] Put another way, she became the target of her superior's sexual desires because she was a woman, and was asked to bow to his demands as the price for holding her job. The circumstance imparting high visibility to the role of gender in the affair is that no male employee was susceptible to such an approach by appellant's supervisor.[56] Thus gender cannot be eliminated from the formulation which appellant advocates, and that formulation advances a prima facie case of sex discrimination within the purview of Title VII.

■ It is clear that the statutory embargo on sex discrimination in employment is not confined to differentials founded wholly upon an employee's gender. On the contrary, it is enough that gender is a factor contributing to the discrimination in a substantial way.[57] That this was the intent of

the record in its current posture portrays a superior placing on a female subordinate a substantial employment condition which he would not seek to levy on a man. See note 55 *infra*. The situation is very different from instances of sexual affairs between an agency's employees which are not tied to employment opportunity in any way.

**50.** *Cf. Phillips v. Martin Marietta Corp.,* 400 U.S. 542, 544, 91 S.Ct. 496, 497–498, 27 L.Ed.2d 613, 615–616 (1971). Title VII expressly prohibits "discriminat[ion] against any individual with respect to . . . [the] term, conditions, or privileges of employment, because of such individual's . . . sex . . . ." See text *supra* at note 24. As we have said, the Equal Employment Opportunity Act of 1972 now confers the same protection upon federal employees. See text *supra* at note 43.

**51.** The Act tolerates any sex-based distinction in employment which is a "bona fide occupational qualification" for the position in question. Civil Rights Act of 1964, tit. VII, § 703(e), 42 U.S.C.A. § 2000e–2(e) (1970). By appellant's assessment, her only alternatives were to submit to sexual blackmail or suffer adversity as an employee. Appellee, quite understandably, does not argue that provision of sexual services can qualify as a "bona fide occupational qualification" for women in federal employment.

**52.** See text *supra* at note 21.

**53.** Brief for Appellee at 20.

**54.** See note 49 *supra*.

**55.** It is no answer to say that a similar condition could be imposed on a male subordinate by a heterosexual female superior, or upon a subordinate of either gender by a homosexual superior of the same gender. In each instance, the legal problem would be identical to that confronting us now—the exaction of a condition which, but for his or her sex, the employee would not have faced. These situations, like that at bar, are to be distinguished from a bisexual superior who conditions the employment opportunities of a subordinate of either gender upon participation in a sexual affair. In the case of the bisexual superior, the insistence upon sexual favors would not constitute gender discrimination because it would apply to male and female employees alike.

**56.** See text *supra* at note 49.

**57.** See cases cited *infra* note 63. We have previously held that not every dissimilarity in employment conditions respectively set for the sexes impinges on Title VII. In *Dodge v. Giant Food, Inc.,* 160 U.S.App.D.C. 9, 488 F.2d 1333 (1973), finding that different grooming standards for men and women did not violate the statute, we observed that Title VII was not intended to encompass minor sexual classifications which "do not limit employment opportu-

Congress is readily apparent from a small but highly significant facet of the legislative history of Title VII. When the bill incorporating Title VII was under consideration in 1964, an amendment that would have expressly restricted the sex ban to discrimination based solely on gender was defeated on the floor of the House.[58] Like the Fifth Circuit, we take this as an indication of congressional awareness of the debilitating effect that such a limitation would have had on any attempt to stamp out sex-based factors irrelevant to job competence.[59]

Interpretations of the Act, both judicial and administrative, more than adequately reflect this understanding and appreciation of the legislative purpose. In *Phillips v. Martin Marietta Corporation*,[60] the Supreme Court held that a company's refusal of employment to mothers but not to fathers of pre-school-age children was prima facie sex discrimination within the meaning of Title VII.[61] Not all women were excluded from the employment, but only those who had

pre-school-age children. Nonetheless, since gender was a criterion in the determination of employability, a prima facie violation of Title VII was shown.[62] Other courts, in analogous contexts, have similarly concluded that distinctions predicated only partly though firmly on gender are covered by Title VII's ban on sex discrimination.[63] And an administrative interpretation of the Act commanding deference [64] is the Equal Employment Opportunity Commission's pronouncement that "so long as sex is a factor in the application of" an employer's rule forbidding marriage by female employees, "such application involves a discrimination based on sex." [65]

In all of these situations, the objectionable employment condition embraced something more than the employee's gender, but the fact remained that gender was also involved to a significant degree. For while some but not all employees of one sex were subjected to the condition, no employee of the opposite sex was affected, and that is the picture here.[66] It does not suffice to

---

.nities by making distinctions based on immutable personal characteristics, which do not represent any attempt by the employer to prevent the employment of a particular sex, and which do not pose distinct employment disadvantages for one sex." *Id.* at 12, 488 F.2d at 1337 (footnotes omitted). See also *Fagan v. National Cash Register Co.*, 157 U.S.App.D.C. 15, 481 F.2d 1115, 27 A.L.R.Fed. 257 (1973); *Willingham v. Macon Tel. Publishing Co.*, 507 F.2d 1084, 26 A.L.R.Fed. 1 (5th Cir. *en banc* 1975). By contrast, the case at bar harbors a treatment differential allegedly predicated upon an immutable personal characteristic—gender—which subjected appellant to a marked disadvantage in comparison with men employed by the Agency.

**58.** 110 Cong.Rec. 2728, 13825 (1964).

**59.** *Willingham v. Macon Tel. Publishing Co., supra* note 57, 507 F.2d at 1089.

**60.** 400 U.S. at 544, 91 S.Ct. at 497–498, 27 L.Ed.2d at 615–616.

**61.** The Court remanded the case for a determination as to whether the condition imposed was "a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise." *Id.* at 544, 91 S.Ct. at 498, 27 L.Ed.2d at 616. See note 51 *supra*.

**62.** See text *supra* at note 57.

**63.** *Willingham v. Macon Tel. Publishing Co., supra* note 57, 507 F.2d at 1089; *Sprogis v. United Air Lines, Inc.*, 444 F.2d 1194, 1198 (7th Cir.), *cert. denied*, 404 U.S. 991, 92 S.Ct. 536, 30 L.Ed.2d 543 (1971). See also *Gillin v. Federal Paper Bd., Co.*, 479 F.2d 97, 102 (2d Cir. 1973).

**64.** See, *e. g., Griggs v. Duke Power Co., supra* note 34, 401 U.S. at 433–434, 91 S.Ct. at 854–855, 28 L.Ed.2d at 165; *United States v. City of Chicago, supra* note 47, 400 U.S. at 10, 91 S.Ct. at 20, 27 L.Ed.2d at 12–13; *Udall v. Tallman, supra* note 47, 380 U.S. at 4, 85 S.Ct. at 795, 13 L.Ed.2d at 619. *Cf. General Elec. Co. v. Gilbert*, 429 U.S. 125, 140–145, 97 S.Ct. 401, 410–413, 50 L.Ed.2d 343, 357–360 (1976).

**65.** 29 C.F.R. § 1604.4(a) (1975).

**66.** See notes 49 & 55 *supra* and accompanying text. An analogy is afforded by *Slack v. Havens*, 7 F.E.P.Cas. 885, 890 (S.D.Cal.1973), *aff'd*, 522 F.2d 1091 (9th Cir. 1975), where four black women were discharged as a result of their refusal to perform heavy cleaning, assertedly not part of their duties and required of them simply because of their race. The one white woman assigned to their department, who had less seniority than three of the four, was transferred elsewhere to work for the day,

say, as the District Court did, that appellant's position was eliminated merely because she refused to respond to her supervisor's alleged call for sexual favors.[67] Appellant's gender, just as much as her cooperation, was an indispensible factor in the job-retention condition of which she complains, absent a showing that the supervisor imposed a similar condition upon a male co-employee.[68]

We also note that, in disposing of this case, the District Court referred to it as "a controversy underpinned by the subtleties of an inharmonious personal relationship." [69] Were we satisfied that this characterization was but a part of the reasoning underlying the court's ruling that the discrimination was not sex-based, we would have no need to address it further.[70] The fact is, however, that we are uncertain as to the reach of the court's observation, and concerned about implications to which it is susceptible.

█ If the court meant that the conduct attributed to appellant's supervisor fell outside Title VII because it was a personal escapade rather than an agency project, no

id. at 887, and another black employee then on loan to another department was returned to aid in the cleaning. Id. at 889. En route to the office to collect their final pay checks, the four plaintiffs were told by their supervisor that "[c]olored folks are hired to clean because they clean better." Id. at 887. There were no allegations of racial discrimination other than with respect to this one incident. Over the employer's objection that the dispute related solely to job classification, id. at 889, the court held that the discharge was violative of Title VII because the plaintiffs' superiors

> meant to require the plaintiff to perform the admittedly heavy and possibly dangerous work of cleaning the bonding and coating department when they would not require the same work from plaintiffs' white fellow employee. Furthermore, [they] meant to enforce the decision by firing the plaintiffs when they refused to perform that work. The consequence of the above was racial discrimination whatever the motivation of the management of defendant . . . may have been.

Id. at 890. On appeal, the Ninth Circuit affirmed the ruling on discrimination but remanded the case for recalculation of backpay. 522 F.2d at 1095. Like the plaintiffs in Slack, appellant asserts that she was confronted by demands that would not have been made upon her but for her sex, and that her refusal to comply with them led to abolition of her job. That the demand here was for sexual relations is of no consequence. See note 49 supra.

**67.** See text supra at note 21.

**68.** See text supra at note 49. On this account, we believe that General Elec. Co. v. Gilbert, supra note 64, and Geduldig v. Aiello, 417 U.S. 484, 94 S.Ct. 2485, 41 L.Ed.2d 256 (1974), are distinguishable. In General Electric, it was concluded that exclusion of benefits for pregnancy from an employer's otherwise comprehensive disability plan did not work a discrimination attributable to sex. The Court relied heavily upon its earlier holding in Geduldig that

a similar state-sponsored plan did not infringe the Fourteenth Amendment. The Court reasoned that neither program foreclosed anyone from eligibility for benefits because of gender, but merely removed one risk from the coverage provided. As analyzed in each case, "[t]he program divides potential recipients into two groups—pregnant women and non-pregnant persons. While the first group is exclusively female, the second includes members of both sexes." General Elec. Co. v. Gilbert, supra note 64, 429 U.S. at 135, 97 S.Ct. at 407, 50 L.Ed.2d at 353, quoting Geduldig v. Aiello, supra, 417 U.S. at 496–497 n. 20, 94 S.Ct. at 2492 n. 20, 41 L.Ed.2d at 264–265 n. 20. There was no showing that there were risks against which men were protected and women were not, or vice versa; or that the total package of benefits gave an advantage to men over women; or that the exclusion of pregnancy benefits was a subterfuge for discrimination against women.

As we read these decisions, they do not condone discrimination bottomed partly though not wholly on sex, or sex discrimination against some but not all women. By the Court's appraisal, men and women were treated equally in terms of protection conferred by the disability plans, and that led to the view that there was no discrimination at all. Moreover, the opinion in neither case suggests that the Court was retreating from its decision in Phillips v. Martin-Marietta Corp., supra note 50, which invalidated a condition barring women from employment only if they had pre-school-age children, and affected no one else at all. See text supra at notes 60–62. When, as in the case before us, a woman is subjected to an employment condition by a superior who leaves all men completely free from that condition, it cannot be said that there is parity of treatment as found in General Electric and Geduldig, or that there is not a sex-predicated discrimination as found in Phillips.

**69.** See text supra at note 21.

**70.** See text supra at notes 54–56.

support for a summary judgment could be derived therefrom. Generally speaking, an employer is chargeable with Title VII violations occasioned by discriminatory practices of supervisory personnel.[71] We realize that should a supervisor contravene employer policy without the employer's knowledge and the consequences are rectified when discovered, the employer may be relieved from responsibility under Title VII.[72] But, so far as we are aware, the agency involved here is not in position to claim exoneration on that theory.

■ If, on the other hand, the court was saying that there was no actionable discrimination because only one employee was victimized, we would strongly disagree. A sex-founded impediment to equal employment opportunity succumbs to Title VII even though less than all employees of the claimant's gender are affected.[73] The pro-

tections afforded by Title VII against sex discrimination are extended to the individual,[74] and "a single instance of discrimination may form the basis of a private suit."[75] To briefly illustrate, suits have been entertained where a woman charged that she was fired because she was pregnant and unmarried, notwithstanding the fact that no other woman was discharged for that reason,[76] and where a male nurse asserted that he was denied assignments to care for female patients, although no allegations were made with respect to the assignment of other male nurses.[77] Close analogies emerge from situations wherein a black woman was terminated ostensibly for personality conflicts but allegedly was told that she probably did not need the job anyway because she was married to a white male,[78] and where a white woman attrib-

71. See, e. g., *Young v. Southwestern Sav. & Loan Ass'n,* 509 F.2d 140, 144 n. 7, 145 (5th Cir. 1975); *Anderson v. Methodist Evangelical Hosp., Inc.,* 464 F.2d 723, 725 (6th Cir. 1972); *Slack v. Havens, supra* note 66, 7 F.E.P.Cas. at 890; *Ostapowicz v. Johnson Bronze Co.,* 369 F.Supp. 522, 536 (W.D.Pa.1973), *aff'd in part and vacated in part on other grounds,* 541 F.2d 394 (3d Cir. 1976); *Tidwell v. American Oil Co.,* 332 F.Supp. 424, 436 (D.Utah 1971). See also *Sibley Memorial Hosp. v. Wilson,* 160 U.S.App. D.C. 14, 15–16, 18, 488 F.2d 1338, 1339–1340, 1342 (1973); *Baxter v. Savannah Sugar Ref. Corp.,* 495 F.2d 437, 441–442 (5th Cir.), *cert. denied,* 419 U.S. 1033, 95 S.Ct. 515, 42 L.Ed.2d 308 (1974); *McMullen v. Warner,* 416 F.Supp. 1163, 1165–1167 (D.D.C.1976). But see *Corne v. Bausch & Lomb, Inc.,* 390 F.Supp. 161, 163 (D.Ariz.1975), *appeal docketed,* No. 75–1857 (9th Cir. Mar. 26, 1975).

72. See, e. g., *Miller v. Bank of America,* 418 F.Supp. 233, 235–236 (N.D.Cal.1976) (official policy of bank to discourage sexual conduct, and bank not advised of behavior by filing of grievance with Employer Relations Department); *Howard v. National Cash Register Co.,* 388 F.Supp. 603, 605–606 (S.D.Ohio 1975) (racial slurs by fellow employees always investigated and employees disciplined).

73. See cases cited *infra* notes 75–80.

74. See text *supra* at note 24.

75. *King v. Laborers Int'l Union,* 443 F.2d 273, 278 (6th Cir. 1971). There an employee alleged that because of his race he had been denied equal opportunity to appear on his union's picket line, in violation of Title VII. The em-

ployee had been afforded a jury trial on his claim—a matter which the trial court was told to reconsider on remand—and the jury had been instructed that it was incumbent upon the employee to show that there was a discriminatory pattern or practice on the union's part, and that an isolated instance of discrimination would not suffice under the Act. *Id.* at 275. This position was rejected on appeal, and it was held that proof of a single act of discrimination was enough. *Id.* at 278. Compare *Sprogis v. United Air Lines, Inc., supra* note 63, where the court held that the airline's no-marriage policy, which was applied only to female flight attendants and not to male flight attendants or other employees, male or female, violated Title VII. 444 F.2d at 1198. In finding prohibited discrimination, the court held that "[t]he effect of the statute is not to be diluted because discrimination adversely affects only a portion of the protected class." *Id.*

76. *Doe v. Osteopathic Hosp. of Wichita, Inc.,* 333 F.Supp. 1357, 1362 (D.Kan.1971). The court held that it was irrelevant that there were no other known females discharged because of unwed pregnancies in the past five years, because Title VII prohibits discrimination against "any individual."

77. *Sibley Memorial Hosp. v. Wilson, supra* note 71, 160 U.S.App.D.C. at 18, 488 F.2d at 1342.

78. *Vuyanich v. Republic Nat'l Bank of Dallas,* 409 F.Supp. 1083, 1089 (N.D.Tex.1976). Although the charge filed with the Commission by Vuyanich was only one of race discrimination, the court noted that the statement to the

uted loss of her job to her relationship with a black man.[79] In each of these instances, a cause of action was recognized although it did not appear that any other individual of the same gender or race had been mistreated by the employer.[80]

At no time during our intensive study of this case have we encountered anything to support the notion that employment conditions summoning sexual relations between employees and superiors are somehow exempted from the coverage of Title VII.[81] The statute in explicit terms proscribes discrimination "because of . . . sex,"[82] with only narrowly defined exceptions completely foreign to the situation emerging here.[83] The legislative history similarly discloses a congressional purpose to outlaw any and all sex-based discrimination,[84] equally with any other form of discrimination which Title VII condemns.[85] Beyond these considerations, the courts have consistently recognized that Title VII must be

construed liberally to achieve its objectives;[86] as we ourselves recently noted, it "requires an interpretation animated by the broad humanitarian and remedial purposes underlying the federal proscription of employment discrimination."[87] It would be pointless to speculate as to whether Congress envisioned the particular type of activity which the job-retention condition allegedly levied on appellant would have exacted. As Judge Goldberg of the Fifth Circuit has so well put it,

> Congress chose neither to enumerate specific discriminatory practices, nor to elucidate in extenso the parameter of such nefarious activities. Rather, it pursued the path of wisdom by being unconstrictive, knowing that constant change is the order of our day and that the seemingly reasonable practices of the present can easily become the injustices of the morrow.[88]

plaintiff "clearly smacks of sexual as well as racial discrimination," since implicit in the statement was the assumption that the male spouse is more important economically and therefore the dismissal might not have occurred had plaintiff been a black male instead of a black female. *Id.* at 1089.

**79.** *Whitney v. Greater New York Corp. of Seventh-Day Adventists,* 401 F.Supp. 1363, 1366–1367 (S.D.N.Y.1975).

**80.** See also *McCreesh v. Berude,* 385 F.Supp. 1365, 1368 (E.D.Pa.1974) (denial of summary judgment to employer in action where employee alleged merely that she would have been promoted on time had she been male or nonwhite).

**81.** We are advertent to appellee's plaint that "if the claim which appellant presents were to be found to be justiciable within the framework of a Title VII action, the District Court—and, inevitably, this Court—will find itself embroiled in the resolution of controversies involving claimed denials of employment enhancement on the ground of sex discrimination when the alleged basis of the denials are personal relationships made 'inharmonious' by the influence of a wide range of sexual stereotypes upon unenlightened supervisors." Brief for Appellee at 27. This consideration is wholly beside the point in this forum. We cannot assume that Congress did not realize that any problem in this connection inheres also in claims of employment discrimination stemming from race,

color, religion or national origin, and that any such difficulty is treatable by measures other than disregard of the legislative will. *Cf. Miller v. Laird,* 349 F.Supp. 1034, 1044 (D.D.C.1972). In designating gender as one of the founts from which discrimination must not flow, "Congress has made the choice, and it is not for us to disturb it." *Chandler v. Rodebush, supra* note 18, 425 U.S. at 864, 96 S.Ct. at 1961, 48 L.Ed.2d at 433.

**82.** See note 24 *supra* and accompanying text.

**83.** See Civil Rights Act of 1964, §§ 703(e) & (h), as amended, 42 U.S.C. §§ 2000e–2(e) & (h) (1970).

**84.** See text *supra* at notes 28–33.

**85.** See text *supra* at note 31.

**86.** See, *e. g., Henderson v. Eastern Freight Ways, Inc.,* 460 F.2d 258, 260 (4th Cir. 1972), *cert. denied,* 410 U.S. 912, 93 S.Ct. 976, 35 L.Ed.2d 275 (1973); *Reeb v. Economic Opportunity Atlanta, Inc.,* 516 F.2d 924, 929 (5th Cir. 1975); *Culpepper v. Reynolds Metals Co.,* 421 F.2d 888, 891 (5th Cir. 1970).

**87.** *Coles v. Penny,* 174 U.S.App.D.C. 277, 284, 531 F.2d 609, 616 (1976).

**88.** *Rogers v. EEOC,* 454 F.2d 234, 238 (5th Cir. 1971), *cert. denied,* 406 U.S. 957, 92 S.Ct. 2058, 32 L.Ed.2d 343 (1972).

Against this backdrop, we cannot doubt that Title VII intercepts the discriminatory practice charged here.[89] The judgment appealed from is accordingly reversed, and the case is remanded to the District Court for further proceedings consistent with this opinion.[90]

*Reversed and remanded.*

MacKINNON, Circuit Judge, concurring:

I concur in the remand of this case, but would narrowly limit the area in which petitioner·can assert her claim against the Environmental Protection Agency. In support of that position, I offer the following analysis of vicarious liability of an employer for acts of its agents.

The liability of an employer for sexual harassment imposed on an employee by a supervisor requires reference to the law of agency and tort, as well as statutory interpretation. The starting point must be that supervisors act, generally, as agents of the employer. In certain circumstances, the relationship can be closer, so that the supervisor could be termed a servant of the employer.

An act of sexual harassment which caused the victim, because of her rejection of such advances, to be damaged in her job, would constitute a tort. Four other district courts have considered the question presented here; each has started from (and two have proceeded no further than) a tort perspective. *Tomkins v. Public Service Electric & Gas Co.,* 13 F.E.P.C. 1574 (D.N.J. 1976); *Williams v. Saxbe,* 12 F.E.P.C. 1093 (D.D.C.1976); *Miller v. Bank of America,* 418 F.Supp. 233 (N.D.Cal.1976); *Corne v. Bausch & Lomb,* 390 F.Supp. 161 (D.Ariz.

1975). Where sexual favors are solicited in return for job benefits or under retaliatory threats to expose one's deficiencies on the job, the gravity of the incident might also constitute a violation of the criminal laws.[1] On the civil side, a question arises whether a principal can be held liable for the tort of the agent.

Under general rules of agency, "A Master is not subject to liability for the torts of his servants acting outside the scope of their employment." *Restatement (Second) of Agency* § 219(2) (1958). The present case offers no suggestion that the sexual harassment was even arguably within the scope of employment and certainly it would not be so understood by any federal employee. The sexual harassment furthered no objective of the government agency, nor was it part of the supervisor's actual or ostensible authority, nor was it even within the outermost boundaries of what could be perceived to be his apparent authority.

To the general rule, however, the *Second Restatement of Agency* attaches four exceptions. The first three involve situations where culpability would naturally apply to the principal: "(a) the master intended the conduct or the consequences, or (b) the master was negligent or reckless, or (c) the conduct violated a non-delegable duty of the master . . . ." None of these are here relevant, though if the government had prior knowledge of the offending supervisor's propensity for sexual harassment of subordinate employees, liability might be based on negligence or reckless conduct. The fourth exception considers situations where "the servant purported to act or to speak on behalf of the principal and there

**89.** The same result has been reached in the District Court. *Williams v. Saxbe,* 413 F.Supp. 654 (D.D.C.1976). We are aware that other courts have reached the opposite conclusion. *Corne v. Bausch & Lomb, Inc., supra* note 71; *Miller v. Bank of America, supra* note 72; *Tomkins v. Public Serv. Elec. & Gas Co.,* 422 F.Supp. 553 (D.N.J.1976). With the latter, we must respectfully disagree.

**90.** On remand, appellant will be at liberty to renew her motion for leave to amend her complaint. See note 18 *supra.*

1. D.C. Code § 22–2305 (1973) provides:
   Whoever verbally or in writing accuses or threatens . . to expose or publish any [person's] infirmities or failings, with intent . . . to compel the person accused or threatened to do . . . any act, and whoever with such intent publishes any such accusation . . . shall be imprisoned . . . [etc.]

was reliance upon apparent authority, or he was aided in accomplishing the tort by the existence of the agency relation." *Restatement (Second) of Agency, supra.*

The exception is stated in the disjunctive. The first part has no application here—it could not be reasonably believed by an employee that the supervisor's demands derived from the employer or that in complying with such demands the employee actually relied upon the authority of the employer. Concerning the second part of the exception, at first reading it seems to argue too much. In every case where vicarious liability is at issue, the agent will have been aided in some way in committing the tort by the position that he holds. In this case, the male supervisor would not have been in a position to ask petitioner for an "after-hours affair" were it not for his position as her immediate "boss."

The examples provided in the *Restatement* commentary, however, indicate that a narrower concept is involved. The tort must be one accomplished by an instrumentality, or through conduct associated with the agency status.

> In other situations, the servant may be able to cause harm because of his position as agent, as where a telegraph operator sends false messages purporting to come from third persons. . . . Again, the manager of a store operated by him for an undisclosed principal is enabled to cheat the customers because of his position.

*Restatement (Second) of Agency* § 219 Comment at 485.

The telegraph operator commits the tort *via* a telegraph message; the store manager commits the tort through the way he charges for what he sells. If the supervisor falsified the report of the quality of the female employee's work, that might (arguably) be a tort of defamation within the stated exception; but the tort involved in the sexual advance is committed entirely outside of the employment milieu.

Turning to the master-servant vicarious liability in tort law, the same conclusion is reached. Again, the first hurdle is to determine whether the activity is within the scope of employment. It was not so in this case. There might still be a possibility of holding the master liable for acts outside of the scope of that employment. The exception is stated with an example of another kind of tort in W. L. Prosser, *Handbook of the Law of Torts* (4th ed. 1971) 465–66:

> The most difficult questions arise where the servant, for strictly personal reasons and not in furtherance of his employment, loses his temper and attacks the plaintiff in a quarrel which arises out of the employment . . . . Here, unless some nondelegable duty can be found, the older rule denied recovery, and this is still the holding of the majority of the decisions. There has been a tendency in the later cases, however, to allow recovery on the ground that the employment has provided a peculiar opportunity and even incentive for such loss of temper; and there have been California decisions which have found something of an analogy to the workmen's compensation acts, and have considered that the intentional misconduct arises out of and in the course of the employment.

Even if this court were to join what is admittedly a minority of jurisdictions on this point, the exception would not here apply. While the supervisor has been provided with an opportunity by the agency, it is no more than would be afforded by any employment setting, and can hardly be said to comprise an "incentive" for such tortious conduct.

There being no basis for liability by the employer in a situation like the one presented in this case, under the general law of agency and tort, there is even less basis for vicarious liability if the supervisor's action were characterizable under the criminal law. *See Restatement (Second) of Agency* § 231.

Analysis of liability of an employer for violation of Title VII takes us beyond the common law of agency and tort, but the rules operative in those spheres provide a necessary starting point. From this basis, we are led to the conclusion that, if liability

is to be placed upon an employer, it must be because of the wording and policy of the legislation. Without the interposition of statutory law, the common law would impute no liability.

Title VII includes in its definition of employer "any agent" of one who fits the general definition. 42 U.S.C. § 2000e(b).[2] The District Court in *Tomkins v. Public Service Electric & Gas Co., supra,* emphasized the reference to agent in the general definition, though eventually that court found that the sexual advances involved there were outside the purview of the supervisor's authority:

> Insofar as the quoted language suggests that acts done for the private benefit of an individual supervisor cannot be imputed to the Employer for the purpose of finding a violation of Title VII, this Court respectfully disagrees. If a supervisor is acting within the purview of his authority, the doctrine of *respondeat superior* may be employed whether he is driving a company car or victimizing a female. See Title 42 United States Code, § 2000e(b) which expressly includes any agent of an employer within the meaning of "employer."

The other significant legislative scheme governing employer-employee relations, the National Labor Relations Act, defines employer in a similar way: "The term 'employer' includes any person acting as an agent of an employer, directly or indirectly." 29 U.S.C. § 152(2) (1970). To the extent that the term "agency" is used, however, the usual principles of agency are invoked; and, as has been seen, those rules would deny government liability as an employer in a case such as this. The supervisor is not acting as an agent when he commits the tort complained of; hence, no unlawful employment practice has been committed by the "employer."

However, the action complained of does not terminate with the mere sexual advance. In the present case, and in others of this type, it is alleged that the employee's refusal to comply led the supervisor to take unfavorable employment-related actions against her. If those employment-related actions were unjustified, then the issue arises of holding the employer liable for those actions. Even where the tort complained of arose in the employment setting, if it was not committed within the *scope of* the supervisor's authority, the employer will not be liable.

A different interpretation has been followed, however, where the tortious conduct is also violative of the National Labor Relations Act. While granting fullest rein to an employer's discretion to hire, promote, or fire for a "good reason, a bad reason, or no reason at all," that statute, as interpreted by the courts, delineates certain impermissible reasons (such as discrimination for or against union members); and when those impermissible reasons are involved, the normal rules of vicarious liability are not applied. For example, if a supervisor singles out union members for abusive treatment, neither actual nor constructive knowledge by the personnel director is required to find a section 8(a)(3) violation. The supervisor might even be acting outside the scope of his employment and contrary to the announced policy of the employer, still, to hold that no violation occurred "would provide a simple means for evading the Act by a division of corporate personnel functions." *Allegheny Pepsi-Cola Bottling Co. v. NLRB,* 312 F.2d 529, 531 (3d Cir. 1962). This approach has even been extended so far as to find a violation in the combination of two acts, by two different members of management, where each was itself permissible.[3]

As it is a departure from the common law rule, the approach to liability adopted by courts applying the National Labor Rela-

---

**2.** This provision does not, technically, apply to the federal government, but other parts of the amended Title VII do.

**3.** In a case of selective discharge, the personnel director who orders the firing might not actual-

ly know that the employee was a union supporter, but it is sufficient if a foreman does, because his knowledge will be imputed to the employer as an entity. *Texas Aluminum Co. v. NLRB,* 435 F.2d 917, 919 (5th Cir. 1970).

tions Act must be carefully scrutinized to determine whether it should be followed in a related, but significantly distinct context.

First, whatever reliance can be drawn from the legislative history of the National Labor Relations Act, and its statement of policy to encourage collective bargaining, is inapplicable to Title VII. Combing the legislative history of the Civil Rights Act turns up no direct statement that employers are to be vicariously liable.

However, the Supreme Court has found that "The objective of Congress in the enactment of Title VII is plain from the language of the statute," *Griggs v. Duke Power Co.,* 401 U.S. 424, 429, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971), and relying on that language alone, has developed strong rules of employer liability. *See, e. g., Franks v. Bowman Transportation Co.,* 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976) (retroactive seniority relief required, despite section 703(h) of Title VII); *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975) (backpay even in the absence of bad faith); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) (prima facie case met, even in particular case, with no showing of intent to discriminate); *Griggs v. Duke Power Co.,* 401 U.S. 424, 432, 91 S.Ct. 849, 854, 28 L.Ed.2d 158 (1971) ("Congress has placed on the employer the burden of showing that any given requirement must have a manifest relationship to the employment in question").

Accordingly, what legislative history cannot itself supply has been suggested by a reading of the statute's intent from its overall scheme. Common elements may be found between the liability for employer conduct under Title VII and employer liability, as traced above, under the National Labor Relations Act. Generally, liability has been premised on one of three (non-exhaustive) rationales: 1) if ambiguous con-

duct might be violative of the statute, the employer is in the best position to know the real cause, and to come forward with an explanation; 2) the employer, not the employee, can establish prophylactic rules which, without upsetting efficiency, could obviate the circumstances of potential discrimination; 3) the type of conduct at issue is questionable at best, and it is not undesirable to induce careful employers to err on the side of avoiding possibly violative conduct.

The first rationale is the premise behind many Title VII cases involving subjective decision-making. *See, e. g., United States v. N. L. Industries, Inc.,* 479 F.2d 354, 368 (8th Cir. 1973); *Rowe v. General Motors Corp.,* 457 F.2d 348, 358 (5th Cir. 1972). For a fine analysis of contemporary Title VII law, see Lopatka, *A 1977 Primer on the Federal Regulation of Employment Discrimination,* 1977 U.Ill.L.For. 69 (1977), especially at 89 (subjective decisions). *See also* Stacy, *Subjective Criteria in Employment Decisions Under Title VII,* 10 Georgia L.Rev. 732 (1976). This rationale also seems to underlie the Supreme Court's strict formulation of liability in the related field of jury discrimination: when the percentages show a large disparity, it is for the state or county to offer explanations. *See, e. g., Castaneda v. Partida,* 45 U.S.L.W. 4302 (U.S. March 23, 1977); *Alexander v. Louisiana,* 405 U.S. 625 (1972); *Turner v. Fouche,* 396 U.S. 346, 359–360, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1970).

The second rationale finds clearest expression in the Supreme Court's decisions involving employment testing. Although explicitly permitted by Title VII, 42 U.S.C. § 2000e–2(h) (1970), the Court's approach in *Griggs v. Duke Power Co., supra,* and *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975) has displayed a great suspicion.[4] Employers who use general knowledge or aptitude tests are

---

4. In *Albemarle,* the Court stated that a plaintiff, even after the employer had shown an employment test to be "job related," should be allowed "to show that other tests or selection devices, without a similarly undesirable racial effect would also serve the employer's legiti-

mate interest in 'efficient and trustworthy workmanship'. . . . Such a showing would be evidence that the employer was using the tests merely as a 'pretext' for discrimination." 422 U.S. at 425, 95 S.Ct. at 2375.

not inherently discriminating, but such tests can be made more or less relevant and fair, and it is the employer who controls their imposition. Hence, if discrimination results, he must answer.

In labor relations law under the National Labor Relations Act, the second rationale has also been influential. Even though an employer has a statutory (and constitutional) right to address his employees on the likely effects of a union takeover, predictions about economic consequences of unionization are fraught with potential for implied or actual threat. If such threats develop, the employer is liable. This is so even if it is his supervisors who make the threats, since making predictions is inherently dangerous and the employer could have instructed his supervisors simply to avoid making predictions in talking with employees. *See generally NLRB v. Gissell Packing Co.*, 395 U.S. 575, 618, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969).

The National Labor Relations Act also provides several examples of the third rationale. That rationale underlies the rule adopted by the National Labor Relations Board, and sanctioned by the courts, *Peerless Plywood Co.*, 107 NLRB 427 (1953), whereby employer speeches within 24 hours before the scheduled time of an election are prohibited. Not every employer speech during that time period is coercive, but it is not a severe burden to require that employers order their campaigns without relying on that particular tactic. On the union side, the use of "dual-purpose" authorization cards provide a comparable example of an intrinsically troublesome device, and the Board, and the courts, have seen no harm in inducing an avoidance of the practice.

These general principles by no means exhaust the guiding rules of employer liability in labor relations law, but they do provide a structure useful for focusing on whether *respondeat superior* should be imposed in a particular case. Different conclusions result in varying Title VII contexts.[5] Where sexual advances are involved, it must be candidly recognized at the outset that, even when directed from a supervisor who would be difficult to refuse, the advances themselves might be welcome. It cannot be presumed as a matter of law that the employee is subjected to disfavorable treatment because of the advances. Once it is established, however, that the employee has no interest in the proposal, then the employee may suffer from the continuation of advances. And the eventual damage to her job for failing to accede, if that is a result, is undeniably harmful.

1. *The rationale of an employer's better position to know.* Unlike the case of a standardized employment test, the employer or higher supervisor is not in the best position of anyone to know whether an employee has been unjustly damaged on her job. The sexual advance of a supervisor toward an employee is seldom a public matter; and the distinction between invited, uninvited-but-welcome, offensive-but-tolerated and flatly rejected advances ordinarily does not fall within the special ability of the employer or higher supervisor to discern.

However, once a complaint of offensive advances has been made, the employer's role becomes far more serious. One of the four district court opinions (besides the one currently before us) that have considered sexual advances, based employer liability

---

5. At one end of the spectrum, for example, a supervisor's persistent use of racial epithets would undoubtedly lead to an employer's Title VII liability. Tracing through the three rationales: (1) If uttered often enough, the employer either actually knows of it, or should know of it. (2) A simple order announced by the employer (even before any suggestion of abuse has arisen) would obviate the problem. (3) Name-calling of any kind is close to abuse, and there is no harm from inducing its complete avoidance.

At the other end would be a foreman's unprovoked and unforeseeable attack upon the black workers on a particular job: the employer could not be expected to anticipate it; no general prophylactic rule could have been promulgated to prevent it; to order supervisors to circumvent all occasions where such incidents might arise would severely impede the efficient ordering of work.

precisely on this phase of the incident, "When a female employee registers a complaint of sexual abuse and the company chooses to fire her rather than investigate, the corporate response may constitute discrimination based on sex." *Tomkins v. Public Service Electric & Gas Co., supra.*

In the present case, the complaint fairly includes allegations that the plaintiff's supervisor, whose sexual advances had been spurned, induced other agents of the Environmental Protection Agency to punish her (complaint at J.A. 29); that the Agency was guilty of wrongful action in prosecuting her complaint, informing her that she should not bring a sex but only a race discrimination claim (J.A. 30);[6] that the Civil Service Commission collaborated in frustrating her claim by refusing as a matter of law to reopen the hearings for evidence of sex discrimination (J.A. 31); that "agents and employees of the defendant" retaliated against her for having filed an EEO complaint (J.A. 37, 44—Count II of Amended Complaint); and that harassment both for refusing sexual advances and for filing the EEO complaint was not only imposed by the supervisor who had been made the advances, but also by "other supervisors" within her agency (J.A. 85).

These allegations are sufficient to raise a suspicion under the first rationale that the employer itself knew, or should have known, of the harassment, and hence the common law result of no *respondeat superior* should be considered reversed by the statute. However, under this rationale, the plaintiff still has a substantial burden to prove: as alleged, EPA officials other than Barnes' own supervisor must be shown to have incorrectly or falsely advised plaintiff in processing her complaint, and to have treated her adversely in job assignment, for the purpose of frustrating her Title VII charge and punishing her for bringing it, or with that effect. If plaintiff can prove this, she should prevail.

From a more general perspective, *respondeat superior* should apply, and the common law rule should be ousted, whenever a plaintiff can show that, in addition to the particular sexual advance, and the retaliatory actions by the maker of that advance, other agents of the employer with knowledge of her charges assisted the retaliation or impeded the complaint. That type of showing suffices to shift to the defendant the burden of disproving that the agency had, at the least, a callous disregard of Title VII rights.

2. *Employer's ability to take preventive steps in advance.* An employer could promulgate a rule that no sexual advances were to be made by any supervisors to any employees. The unique problem with this kind of harassment, however, is that its potential is not confined to working hours. Even if a no-advances rule were adopted, it could only with great difficulty be made to apply to employees' "own time."

Hence, there is no basis *under this rationale* to oust the common law rule against *respondeat superior* for acts outside the scope of employment. Nor do the facts of this complaint demonstrate a narrowly definable opportunity for the employer to formulate a specific preventive rule short of prohibiting all off-hours social contacts between employees and supervisors which is of course out of the question.

As the analysis under this rationale unfolds, it is apparent that an employer could somewhat insulate itself from vicarious liability by taking certain preventive measures. At the least, an employer should be free from vicarious liability if it 1) posts the firm's (or government's) policy against sexual harassment by supervisors, and 2) provides a workable mechanism for the *prompt* reporting of sexual harassment, which mechanism 3) includes the rapid issuance of a warning to the supervisor complained of, or the mere notation of a rejected sexual advance for possible future reference in

6. The power of the agency to control her complaint against it and its obligation to see that it

is properly brought is difficult to discern. The agency is the adversary.

case an issue is made of voluntariness, and 4) affords the opportunity of the complainant remaining anonymous.

Here, the established policy of the federal government against sex discrimination,[7] applies to the Environmental Protection Agency, and the 1972 Equal Employment Opportunity Act[8] together with Executive Order No. 11375 (1967)[9] provide a mechanism for reporting and adjusting complaints.[10] Those broad steps are important, and in the present context (where no precise preventive rule was feasible) they suffice to defeat vicarious liability. Nevertheless, detailed procedures along the lines suggested would demonstrate more sensitivity to the particular problem of sexual advances and subsequent discrimination, and, if conscientiously applied, would come close to assuring an employer of protection against vicarious liability in many cases.

3. *Inducing extra caution.* Sexual advances may not be intrinsically offensive, and no policy can be derived from the equal employment opportunity laws to discourage them. We are not here concerned with racial epithets or confusing union authorization cards, which serve no one's interest, but with social patterns that to some extent are normal and expectable. It is the abuse of the practice, rather than the practice itself, that arouses alarm.

Accordingly, there is no justification under this rationale to impose vicarious liability upon an employer.

In summary, I concur in the remand of this case, but on a narrower ground than the majority. Barnes has brought her suit against the Environmental Protection Agency and its administrator, not against a single supervisor. Vicarious liability of an employer would not attach at common law under the facts here alleged, so the suit can be maintained only by reason of a statutory exception. Drawing from labor relations law and equal employment opportunity law, we can isolate three general rationales for overturning the common law and imposing *respondeat superior* or principal-agent liability. Only one of those provides a basis for such a ruling on these facts. That theory is brought into operation by the charge that other management personnel harassed petitioner, that they misled her in filing her complaint, that her supervisors retaliated against her for doing so and that her employer, with knowledge of the facts alleged by her, ratified the discrimination that her supervisor had improperly imposed upon her. Those allegations if true would make a case that the Environmental Protection Agency knew or should have known of the harassment involved.[11] The case should be remanded to allow petitioner a chance to prove this claim.

---

7. It is the policy of the Government of the United States and of the government of the District of Columbia to provide equal opportunity in employment for all persons, to prohibit discrimination in employment because of race, color, religion, sex, or national origin, and to promote the full realization of equal employment opportunity through a continuing affirmative program in each agency.

   5 C.F.R. § 713.202 (1977).

8. 42 U.S.C. § 2000e(a), (Supp. V, 1975).

9. 32 Fed.Reg. 14303 (Oct. 13, 1967) (adding sex to the list of impermissible factors in personnel decisions).

10. *See* 5 C.F.R. §§ 713.211–713.222 (agency adjudication of discrimination complaints); 5 C.F.R. §§ 713.231–713.236 (appeal to U.S. Civil Service Commission) (1977).

11. It was on a similar, limited basis that the Fourth Circuit recently remanded *Garber v. Saxon Business Products, Inc.*, 552 F.2d 1032 (4th Cir. 1977).